U.S. COURT OF APPEALS DOCKET NO. 11-5115

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

DIANNA JOHNSON, et al
Plaintiffs and Appellants,
vs.
GOVERNMENT OF THE DISTRICT OF COLUMBIA, et al

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA
## CASE NO. 1:02-cv-02364-RMC
## [THE HONORABLE ROSEMARY M. COLLYER]

---

## PLAINTIFFS'/APPELLANTS' AMENDED OPENING BRIEF
### (No Oral Argument Has Been Scheduled)

---

Barrett S. Litt
Paul J. Estuar
LITT, ESTUAR & KITSON, LLP
1055 Wilshire Boulevard
Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114
Email: blitt@littlaw.com

WILLIAM CHARLES COLE
CLAIBORNE III
Claiborne Law
717 D. Street, NW
Suite 210
Washington, DC 2004-0000
Telephone: (202) 725-6063
Email: claibornelaw@gmail.com

Attorneys for Plaintiffs/Appellants

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW
## AND RELATED CASES

In accordance with D.C. Cir. Rule 26.1, plaintiff submits the following:

Plaintiffs/Appellants

    Vickie Brooks

    Sandra Clyburn

    Anita Johnson Hairston

    Keisha Holloway

    Rubbiya Muhammed

    Dianne Wilkes

    Plaintiffs Donna Curtis, Dianna Johnson and Carolyn Montgomery have

been dismissed without prejudice.

Appellees

    The Government of the District of Columbia

    Todd W. Dillard

Amicus Curiae

    None

Rulings Under Review

    Under review are three decisions of the United States District for the District

of Columbia entered in civil action 1:02-cv-02364-RMC:

Order granting defendant District of Columbia's motion for summary

judgment entered 10/31/2008, docket 203;

Order denying plaintiffs' Motion for Leave to File Third Amended

Complaint entered 01/14/2010, docket 226;   and

Order granting defendant Dillard's Motion for Judgment on the Pleadings, or

in the alternative, Motion for Summary Judgment and denying plaintiffs' Motion

for Partial Summary Judgment and dismissing the case entered 04/21/2011, docket

273.

Related Cases

Plaintiff is aware of no related cases pending in the Court.

DATED: October 19, 2012            Respectfully Submitted,

LITT, ESTUAR, & KITSON LLP
LAW OFFICES OF WILLIAM C.
CLAIBORNE

By___/s/ Barrett S. Litt_____
     Barrett S. Litt
     Attorneys for Plaintiffs/Appellants

# TABLE OF CONTENTS

I.  JURISDICTIONAL STATEMENT ................................................... 1

II.  STATEMENT OF ISSUES ......................................................... 1

III.  STATEMENT OF THE CASE ..................................................... 2
    a.  Plaintiffs' Claims ............................................................. 2
    b.  Procedural History Below ................................................. 3
    c.  Procedural History in this Court ....................................... 4
    d.  Standard of Review ........................................................ 4

IV.  STATEMENT OF FACTS ......................................................... 4
    a.  Strip Searching Persons  Likely To Be Released ...................... 4
    b.  MPD Brought Lock-Ups To Superior Court For Presentment ....... 7
    c.  The Marshal's Cellblock Operations ................................... 9
        1.  Deputies Received Arrestees and Jail Cases in the Sally-Port ........... 9
        2.  To The Cellblock In Elevators ..................................... 11
        3.  Female Arrestees Were Held Separately Until Called Into Presentment Courtrooms. ....................................... 13
        4.  The Vast Majority Of Female Arrestees Were Released At Presentment. ...................................................... 14
        5.  Group Searches .................................................... 15

ARGUMENT ............................................................................ 16

V.  STRIP SEARCHES OF WOMEN ARRESTEES LIKELY TO BE RELEASED VIOLATED THE FOURTH AMENDMENT ............... 16
    a.  There Is No Sound Penological Reason To Conduct Blanket Suspicionless Strip Searches On Arrestees .................................... 16
        i.  <u>Florence</u> factors not present ..................................... 16
        ii.  Arrestees Already Searched Prior to Presentment ............... 17
        iii. Female Arrestees Do Not Present Contraband Risks Justifying Drop, Squat and Cough Searches ................................ 18
        iv. Almost Eighty Percent of Female Arrestees Were Released From the Courtroom ..............................................25
    b.  Blanket Suspicionless Strip Searches Of Arrestees Likely To Be Released Violates The Fourth Amendment ....................................... 26

VI.  THE DISTRICT IS LIABLE FOR THE SUPERIOR COURT
MARSHAL'S STRIP SEARCHES OF ITS ARRESTEES ......................... 31
   a.  Arrestees Were District Prisoners Subject To District Laws................. 32
      i.  Pre-presentment Arrestees Are In District Custody, And No
         Law Mandates That MPD Deliver Arrestees To Superior
         Court Marshal. ................................................................. 32
   b.  Entrustment theory liability. ................................................... 34
      i.  The District Had A Duty To Monitor The Strip Searches. ............... 35
      ii.  In Any Event, The District Had Actual Or Constructive
         Knowledge Of Dillards' Strip Search Practices................................ 35
      iii. The District Is Liable Under The Entrustment Theory..................... 37
      iv. The District Court's Ruling On The District's Liability Under
         The Entrustment Theory Is Wrong........................................... 39
   c.  The District Is Liable Because The Superior Court Marshal Is An
      Organic Part Of The District Government.................................... 44
      i.  The Government Of The District Of Columbia Is Detached From
         The Federal Government And Includes The Superior Court And
         The Superior Court Marshal.................................................. 45
      ii.  The District Is Liable For The Conduct Of Superior Court
         Persons Taken Pursuant To A Policy Or Practice Of The District ... 46
      iii. The Powers of the Superior Court Marshal Flow from the
         Superior Court. ............................................................... 47
      iv. The District Court's Ruling On The District's Liability Under
         The Organic Theory Is Wrong............................................... 51

VII.  PLAINTIFFS RAISED A MATERIAL ISSUE OF FACT ON MARSHAL
DILLARD'S DISCRIMINATORY INTENT ................................. 52
   a.  Dillard's Defense That He Neither Knew About Nor Intended
      Women-Only Strip Searches. ................................................. 52
      i.  The Practice Of Strip Searching Only Women Is Circumstantial
         Evidence Of Intent............................................................ 55
      ii.  Evidence Of Policy Statements................................................ 56
      iii. Conflicts In Testimony Evidence A Cover-Up................................ 59

VIII.  THE TRIAL COURT ERRED IN FINDING QUALIFIED IMMUNITY
FOR THE MARSHAL ON THE FOURTH AMENDMENT
VIOLATIONS. ............................................................... 66
   a.  Even If The Law Was Not Clearly Established By Decisions Of
      This Court, It Was By Virtue Of Court Orders That Bound The
      District And Its Agents. ..................................................... 67

iv

b. Even If The Law Was Not Clearly Established By Decisions Of This Court, It Was Clearly Established By Virtue Of Court Orders That Bound The District And Its Agents. ................................................. 70

c. Plaintiffs' Fourth Amendment claim is Distinguishable From <u>Bame</u>'s Qualified Immunity Analysis ....................................................... 71

d. Pearson Post-Even Rule Does Not Apply ................................................ 74

IX.   CONCLUSION ................................................................................................. 75

# TABLE OF AUTHORITIES

## FEDERAL CASES

\* Act Up!/Portland v. Bagley,
  988 F.2d 868 (9th Cir.1993) ................................................26, 68, 69

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)................................................................61

Ashcroft v. Iqbal,
  129 S. Ct. 1937 (2009)...........................................................54

Ashcroft v. Iqbal,
  556 U.S. 662 (2009)...............................................................52

Atherton v. District of Columbia Office of Mayor,
  567 F.3d 672 (D.C. Cir. 2009)...........................................46, 51

Atwater v. Lago Vista,
  532 U.S. 318 (2001)...............................................................73

Baker v. District of Columbia,
  326 F.3d 1302 (D.C. Cir. 2003)......................................35, 39, 41

Bame v. Dillard,
  637 F.3d 380 (D.C. Cir. 2011)...................... 2, 16, 29, 66, 67, 68, 70, 71, 72, 74

Barham v. Ramsey,
  434 F.3d 565 (D.C. Cir. 2006)..........................................53, 67

Barham v. Salazar,
  556 F.3d 844 (D.C. Cir. 2009)..........................................53, 56

\* Bell v. Wolfish,
  441 U.S. 520 (1979)...................... 7, 19, 26, 27, 28, 31, 67, 68, 72, 73

Bray v. Alexandria Women's Health Clinic,
  506 U.S. 263, 113 S. Ct. 753 (1993)..........................................52, 55

*Authorities upon which we chiefly rely are marked with asterisks.*

Bull v. City and County of San Francisco,
595 F.3d 964 (9th Cir. 2010) (en banc) ........................................................27, 28

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)........................................................................................53

Conroy v. City of Philadelphia,
421 F.Supp.2d 879 (E.D. Pa. 2006)..................................................................43

County of Sacramento v. Lewis,
523 U.S. 833 (1998)........................................................................................34

Daskalea v. District of Columbia,
227 F.3d 433 (D.C. Cir. 2000)..........................................................................34

Davis v. Scherer,
468 U.S. 183, 104 S. Ct. 3012 (1984)...............................................................70

* Deaton v. Montgomery County,
989 F.2d 885 (6th Cir. 1993) .......................................................34, 36, 37, 38

Estelle v. Gamble,
429 U.S. 97 (1976)..........................................................................................34

Evers v. County of Custer,
745 F.2d 1196 (9th Cir. 1984) ........................................................................43

* Farmer v. Brennan,
511 U.S. ...................................................................................37, 53, 54, 55

Fletcher v. Dist. of Columbia,
370 F.3d 1223 *judgment vacated on reh'g on other grnds,* 391 F.3d 250
(D.C. Cir. 2004) ..............................................................................................51

* Florence v. Board of Chosen Freeholders of County of Burlington,
132 S.Ct. 1510 (2012)............................... 7, 15, 16, 17, 24, 26, 27, 28, 31, 72, 73

Fort Sumter Tours, Inc. v. Babbitt,
202 F.3d 349 (D.C. Cir. 2000)...........................................................................4

* Hedgepeth ex rel. Hedgepeth v. Washington Metropolitan Area Transit
Authority,
386 F.3d 1148 (D.C. Cir. 2004)..................................................................43, 44

Helton v. United States,
   191 F. Supp. 2d 179 (D.D.C. 2002)........................................................27, 36, 68

Hope v. Pelzer,
   536 U.S. 730 (2002)...............................................................................71

Hudson v. McMillian,
   503 U.S. 1 (1992)..............................................................................34, 39

Jenkins v. Washington Convention Center,
   236 F.3d 6 (D.C. Cir. 2001).................................................................40, 45

Jett v. Dallas Independent School District,
   491 U.S. 701 (1989)...............................................................................44

Johnson v. Government of District of Columbia,
   584 F.Supp.2d 83 (D.D.C. 2008)....................................................38, 39, 50, 51

Jones v. Murphy,
   470 F.Supp.2d 537 (D.Md.2007).............................................................41, 42

Kline v. 1500 Massachusetts Ave. Apartment Corp.,
   439 F.2d 477 (D.C. Cir. 1970).................................................................36

Kundrat v. District of Columbia,
   106 F. Supp. 2d 1 (D.D.C. 2000)..............................................................47

Langley v. Washington,
   Civ.No. 75-2058 (D.D.C.) .....................................................................1, 2

* Logan v. Shealey,
   660 F.2d 1007 (4th Cir. 1981) .............................................................26, 72, 73

* Mary Beth G. v. Chicago,
   723 F.2d 1263 (7th Cir. 1983) ..................................................................26

Mazloum v. District of Columbia Metropolitan Police Dept.,
   530 F.Supp.2d 282 (D.D.C. 2008).............................................................58

* Morgan v. Barry,
   596 F. Supp. 897 (D.D.C. 1984)........................... 1, 16, 35, 38, 41, 43, 66, 68, 69

Palmore v. United States,
    411 U.S. 389 (U.S. 1973)............................................................40, 45

Pearson v. Callahan,
    555 U.S. 223 (2009)......................................................................74

Pennsylvania Bureau of Correction v. U.S. Marshals Service,
    474 U.S. 34 (1985) (Stevens, J., dissenting).................................48, 49

Quinones v. City of Evanston,
    58 F.3d 275 (7th Cir. 1995) ...........................................................43

Reeves v. Sanderson Plumbing Products, Inc.,
    530 U.S. 133, 120 S. Ct. 2097 (2000)................................................54

Roth v. King,
    449 F.3d 1272 (D.C. Cir. 2006).......................................................47

Savard v. Rhode Island,
    338 F.3d 23 (1st Cir. 2003).............................................................17

St. Mary's Honor Center v. Hicks,
    509 U.S. 502 (1993).......................................................................54

Tatum v. Morton,
    562 F.2d 1279 (D.C. Cir. 1977).........................................................1

United States v. Robinson,
    414 U.S. 218 (1973).......................................................................73

* Warren v. District of Columbia,
    353 F.3d 36 (D.C. Cir. 2004)............................................34, 37, 38, 41

Whitley v. Albers,
    475 U.S. 312 (1986).......................................................................34

Women Prisoners of the D.C. Dep't of Corrections v. District of Columbia,
    93 F.3d 910 (D.C. Cir. 1996)...........................................................34

Youngbey v. March,
    676 F.3d 1114 (D.C. Cir. 2012)........................................................69

## OTHER CASES

Bynum v. District of Columbia,
  02-956 (RCL)....................................................................36, 38

## FEDERAL STATUTES

28 U.S.C. §561 et seq................................................................39, 48

28 U.S.C. §1291.............................................................................1

28 U.S.C. §1331.............................................................................1

28 U.S.C. §1343(a)(3)....................................................................1

28 U.S.C.A. §561(c)...............................................33, 42, 43, 47

28 U.S.C.A. § 66(a).....................................................................48

## OTHER STATUTES

DC Code §23-562 ...................................................32, 40, 42, 49

DC Code §§ 3-1321 et seq. .......................................................32

Court Reorganization Act of 1970.............................................49

Court Reorganization Act D.C. Code §11-1521.........................46

D.C. Code §5-335.01 .........................................................32, 42

D.C. Code §11-101 ..................................................................40

D.C. Code §11-101(2) (2001)..................................................45

D.C. Code §11-1729 ...........................................33, 42, 49, 50

D.C. Code §6-703.......................................................................49

D.C. Code §22-1110..................................................................42

D.C. Code §23-581 ............................................................32, 42

D.C. Code §23-1110...................................................................32

D.C. Code §23-1322(b) and (g) <u>et</u> <u>seq</u>.....................................................41

D.C. Code §24-201.13 .........................................................................33

D.C. Code §24-201.13 and 14 ............................................................49

D.C. Code §§24-201.13 and 24-201.14 ................................40, 41, 42

D.C. Code §24-201.14 ...........................................................33, 48, 50

District of Columbia Court Reform and Criminal Procedure Act of 1970, 91
    Pub. L. No. 358, 84 Stat. 473 (1970) ("Court Reform Act") ...........................45

District of Columbia Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774
    (1973) ("Home Rule Act") ..............................................................45

## RULES

Fed. R. Civ. P. 37(c)(1)(C) and 37(b)(2)(A)(i)-(vi) ...............................59

FRE 801(d)(1)(A) .............................................................................60

Rule 5 .........................................................................................7, 8, 32

Rule 5(a) ..........................................................................................42

Rule 37 .............................................................................................59

Rule 54 .............................................................................................3

## CONSTITUTIONAL PROVISIONS

Fifth Amendment ...............................................................................2, 3

Fourth Amendment ......................................................................passim

## GLOSSARY OF ABREVIATIONS

| | |
|---|---|
| Act | Anti-Drug Abuse Act of 1988 |
| AFIS | Automated Fingerprint Identification System |
| CGIS | Criminal Justice Information Systems |
| CTF | Correctional Treatment Facility |
| D.C.; District | District of Columbia |
| DEO | Non-Sworn Police Department Employee |
| DOB | Date of Birth |
| DOJ | Department of Justice |
| FBOP | Federal Bureau of Prisons |
| FTCA | Federal Tort Claims Act |
| GAO | United States General Accounting Office |
| IMF | IMF/World Bank Protests |
| MDC | Marshal for District of Columbia |
| MPD | Metropolitan Police Department |
| NCIC | National Crime Information Center |
| PDID | Police Department Identification Number |

SMF                                      Statement of Material Facts

USMS; Agency                             United States Marshals Service

WALES                                    Washington Area Law Enforcement
                                         System

## I.    JURISDICTIONAL STATEMENT

The District Court had original jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291. Judgment was entered on 04/21/2011 [Dkt. 273]. Notice of Appeal was filed on 5/4/2011. [Dkt. 274].

## II.    STATEMENT OF ISSUES

1.    Whether the policy of strip searching new arrestees who have not appeared before a magistrate and are likely to be released on their first appearance violates the Fourth Amendment.

2.    Whether the District Court erred by dismissing defendant[1] District of Columbia where the District was liable for injuries caused to class members by Dillard's unconstitutional strip searches by delivering its arrestees to the Superior Court Marshal when the District had a duty pursuant to the Morgan[2] Order [Dkt.

---

[1] Appellants, plaintiffs below, refer to themselves herein as plaintiffs and to appellees as defendants.

[2] The Morgan Order, in effect since entered July 22, 1981, prohibits the District from strip searching or "squat" searching pre-presentment women arrestees held in any District lock-up or outside the general population in the Jail. Morgan v. Barry, 596 F. Supp. 897, 898 (D.D.C. 1984); Morgan v. Barry, 81-cv-1419, Docket Entry No. 82, 1985 (10/29/85 order continuing Morgan Order "for an indefinite period of time"). On December 23, 1975, in Langley v. Washington, Civ.No. 75-2058 (D.D.C.), Judge Green issued a preliminary injunction prohibiting the District from conducting strip searches on parking and traffic arrestees without probable cause to suspect hidden weapons or contraband. Tatum v. Morton, 562 F.2d 1279, 1284-1285 (D.C. Cir. 1977).

138-19] and <u>Langley v. Washington</u> to insure that women were not subjected to blanket strip searches before presentment.

3.    Whether defendant Todd Dillard acted as an organic part of the government of the District of Columbia exercising powers inherited from the office of the Marshal of the District of Columbia in developing and implementing his strip search policies, making the District liable for his actions under <u>Monell</u>.

4.    Whether the District Court erred by granting Dillard's summary judgment on the Fifth Amendment class strip search claim where plaintiffs produced sufficient evidence to create a controverted issue of fact on whether Dillard had an intent to discriminate against the class by establishing a policy of strip searching female but not male arrestees.

5.    Whether the District Court erred by granting defendant Dillard qualified immunity on the Fourth Amendment class strip search claim based on this Court's opinion in <u>Bame v. Dillard</u>, 637 F.3d 380, 382 (D.C. Cir. 2011) that the law was not clearly established.

## III.    STATEMENT OF THE CASE

### a.  Plaintiffs' Claims

Plaintiffs filed a class action complaint on 12/2/2002 alleging that defendant Todd Dillard, former Superior Court Marshal, subjected women arrestees (but not men) brought to the Superior Court cellblock for presentment to blanket strip

searches. They named Dillard in his individual capacity under <u>Bivens</u> and §1983, the United States Marshals Service ("USMS" or the "Agency") under <u>Bivens,</u> and the District of Columbia (also referred to throughout as "D.C." or the "District") under §1983.  Plaintiffs restated the claims in the operative Second Amended Complaint filed 5/24/2007 and added claims against Dillard in his official capacity under both §1983 and <u>Bivens</u>. [Dkt. 117].  Plaintiffs challenged the Superior Court Marshal's blanket strip searches on both Fourth and Fifth Amendment (equal protection) grounds. <u>Id</u>.

### b. *Procedural History Below*

The District Court certified a Fifth Amendment class consisting of all women arrestees brought to the Superior Court for presentment regardless of charge, and a smaller Fourth Amendment class on behalf of women arrestees arrested on minor charges not involving allegations of violence, weapons or drugs. [Dkt. 159] The Court dismissed the United States Marshals Service ("USMS") in that order.  <u>Id</u>.

The Court granted the District's motion for summary judgment on 10/31/2008 [Dkt. 203].  The District never filed a Rule 54 motion to certify the order as a final judgment. Therefore, the grant of summary judgment is an issue on this appeal.

Final judgment was entered on 04/21/2011 in an order granting summary

judgment to Dillard on both strip search claims. [Dkt. 273].

### c. *Procedural History in this Court*

This is the second appeal in this case. Dillard filed an appeal [Dkt. 88] from

the District Court's denial of his motion to dismiss [Dkt. 81]. This Court dismissed

the appeal on defendant's motion. [Dkt. 125].

The clerk dismissed the current appeal for failure to prosecute on 9/19/2011.

[Dkt. 1330204], but the Court granted appellants' motion for reconsideration and

reinstated the appeal on 12/27/2011 [Dkt. 1349678].

### d. *Standard of Review*

Grants of summary judgment are reviewed de novo. *See, e.g.,* Fort Sumter

Tours, Inc. v. Babbitt, 202 F.3d 349, 354 (D.C. Cir. 2000).

## IV.   STATEMENT OF FACTS

### a. STRIP SEARCHING PERSONS LIKELY TO BE RELEASED

As Superior Court Marshal, defendant Todd Dillard established a policy and

practice during the "class period[3]" of subjecting **all women arrestees** and "jail

cases" (**but not men**) brought to the Superior Court Cellblock ("Cellblock") to

non-private blanket strip/squat searches even though 80% of them would be

_____

[3]The class period runs from 12/2/99, 3 years before the case was filed, until at least
4/25/03 when federal defendants filed a paper stating they had stopped the female-
only strip searches. [Dkt. 24.]

4

released from the courtroom at presentment.  <u>Helton</u> [Dkt. 251-1]/<u>Clifton</u> [Dkt.

251-2][4] (prior District cases) interrogatory responses (Responses of United States

to plaintiffs' interrogatories #8, <u>Helton</u>[5] <u>v. United States of America</u>, 01-385 (JDB)

(policy and practice as of 2/21/00); <u>Clifton v. United States of America</u>, 02-578

(JDB) (policy and practice as of 6/29/01)); pp.138-39; [Dkt. 233-57] Shealey

Depo, pp.138-39; [Dkt. 233-29] Michelle Alexander Depo, pp.8:11-12, 45:13-16

(worked in a.m. Cellblock almost daily from February 2002 to March 2003

conducting strip searches to **all female prisoners**); [Dkts. 245, 246] Ps.Ex. 702-

706; Ps.Ex. 701-712; 802-803 (SEALED)

Deputies strip searched women in **groups** in front of **other groups of**

**arrestees and jail cases in the female pod**.  One woman subjected to the drop,

squat, and cough search in 2002 explained that the first of the four in her group

"walked towards the back of the cell where a toilet was, facing the back of the cell,

and pulled her pants and underwear down, and crouched down in a half squat,

displaying her buttocks to the female Marshal" after which the next two women

_____

[4]Exhibits SEALED and lodged but without document numbers are referred to by
plaintiffs' numbers and the document numbers under which they were filed and/or
lodged.

[5]Both <u>Helton</u> and <u>Clifton</u> involved groups of male and female protesters arrested
by the MPD and brought to Superior Court where deputies strip searched women
but not men pursuant to Dillard's strip search policy.  <u>Helton</u>/<u>Clifton</u> interrogatory
responses # 8.  [Dkts. 251-1, 251-2].

did the same. They were subjected to abusive screams by guards, such as "This is what you have to do when you get here." [Dkt. 233-18] Muhammad Depo, p.83:5-7.

A young attorney arrested on September 27, 2002 in Pershing Park the Friday of the 2002 IMF Protests, described the process in an interview with the MPD Civil Rights and Force Investigations Division:

> "[T]he marshals put [five of ] us in a cell, and they told us to drop our pants, drop our pants, bend over, squat and cough, and I thought they were joking, they weren't joking, we all did that in front of each other, in front of the three female marshals, and in front of two women inmates that were not related to the protest, who were across the hall from the holding cell that we were in, you know, completely humiliating, …"

[Dkt. 233-95] MPD Report on IMF Protest Mass Arrests, p.130.

These strip searches were so degrading that even deputies conducting them felt uncomfortable talking about them in a deposition.  E.g. [Dkt. 233-70] Hargrove Depo, p.19:11-16 (Clifton case).

The fundamental and instinctive interest in the privacy of the naked body has been recognized in scripture and literature for millennia.  The first emotion Adam and Eve felt after being expelled from Paradise was shame in their nakedness, leading them to hide themselves[6].  In Dante's Inferno, nakedness is the badge of souls

---

[6] "And the eyes of them both were opened, and they knew that they [were] naked; and they sewed fig leaves together, and made themselves aprons."  *Genesis 3:7*

6

condemned to Hell without hope.  Virtuous pagans and others held before the Gates of Hell remain clothed, but evildoers held beyond the gates in the general population of Hell go naked and humiliated.  Dante Alighieri, <u>Inferno</u>, Canto III.  Echoing these sentiments, in <u>Bell</u>, the Supreme Court wrote that "this practice [of strip searches] **instinctively** gives us the most pause."  <u>Bell</u>, 441 U.S. 5 at 558 (emphasis added).  Recently Justice Alito stated, "Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many."  <u>Florence v. Board of Chosen Freeholders of County of Burlington</u>, 132 S.Ct. 1510, 1524 (2012)(concurring).

There was no legitimate justification for strip searches of female prisoners.  The Agency's justification for the searches was that women, unlike men, have two orifices because they have vaginas.  <u>Helton</u>/<u>Clifton</u> interrogatory responses, #8, [Dkts. 251-1, 251-2]

### b.  *MPD B*ROUGHT *L*OCK*-U*PS *T*O *S*UPERIOR *C*OURT *F*OR *P*RESENTMENT

Plaintiff class members are women arrested on D.C. Code offenses or D.C. warrants under D.C. law and brought to the Superior Court under DC SCR-Crim. Rule 5, promulgated by the Superior Court for presentment and arraignment.  [Dkt. 158].  [Dkt. 233-81] GAO Report, p.65.

As used herein, an "arrestee," or lock-up, is a person arrested and brought to court for presentment pursuant to Superior Court Rule 5, but not yet presented to a judge or magistrate at Superior Court (as opposed to being released from the

7

station).  Id.  A "jail case" is a person brought to Superior Court for a hearing from either the D.C. Jail or D.C.'s Correctional Treatment Facility ("CTF").  Id.  [Dkts. 234, 235] Ps.Ex.522 Cotton Depo, p.100:1-13 (SEALED) Lorton stopped sending male inmates to court before or very early in the class period and never sent women.  Lorton and jail cases had no contact, nor did they intermingle in the cellblock, with lock-ups. Id. p.144:20-22. (SEALED)

The MPD booked and identified arrestees using LiveScan optical fingerprinting machines linked to the FBI's automated fingerprint identification system (AFIS), [Dkt. 233-81] GAO Report, pp.63, 96;  [Dkts. 193-4, 193-5] MPD General Orders "Processing Prisoners," pp.5-6, and ran criminal background checks (twice) using local and national systems including WALES, NCIC, and AFIS which identified past criminal history, current cases and court supervision, [Dkt. 233-81] GAO Report p.62; [Dkt. 233-72] Gantt[7] Depo, pp.17:5-8, 8-9; and placed wristbands generated out of AFIS with a photo, name, PDID, DOB, race and gender on each lock-up, [Dkt. 233-81] GAO Report, p.64.  MPD searched[8]

---

[7] Sheila Gantt worked in the MPD's CJIS Data Conversion section as the CJIS coordinator, responsible for training users of the CJIS application.  [Dkt. 233-72] Gantt depo, pp.5-6.

[8] Detailed descriptions of how MPD handles arrestees from point of arrest to delivery to the Cellblock with citations to the record appear at plaintiffs' objections to Dillard's SMF, numbers 5,6,7,8 and 22. [Dkt. 243-1] MPD frequently subjected persons arrested on suspicion of drugs to inside-the-pants and underwear searches

them thoroughly at arrest, booking and before moving them; kept men and women segregated from point of arrest to delivery to Superior Court, [Dkt. 233-71] Holmes CCB Depo, pp.7-8; and kept arrestees handcuffed during transport, "daisy–chained" to each other (i.e., each lock-up was hand cuffed to the one in front of him) until they went through the magnometers. [Dkt. 233-65] Carter 3D, pp.15:1-12, 29:8-11.

### c. THE MARSHAL'S CELLBLOCK OPERATIONS

### 1.    Deputies Received Arrestees and Jail Cases in the Sally-Port

During the class period, two main categories of prisoners went to Superior Court for hearings: (1) arrestees brought for presentment every day but Sundays by MPD and other agencies, [Dkt. 233-81] GAO Report, p.65; and (2) jail cases brought from the D.C. Jail and CTF by deputies, [Dkts. 234, 235] Ps.Ex.522 Cotton Depo, p.100:1-13 (SEALED), for court hearings weekdays except holidays, and Saturday for fugitive returns. [Dkt. 233-57] Shealey Depo, pp.26:18-21; 29:10-13.

Male and female jail cases arrived at the Superior Court basement sally-port in buses driven by deputies (which includes non-sworn employees known as "DEOs" hired to handle prisoners). The jail cases are locked in leg irons and "belly

---

before transporting them to Superior Court. Mark Shealey, Cellblock supervisor, knew this. [Dkt. 233-57] Shealey Depo, p.346:6-14.

chains," handcuffed, with the handcuffs chained to the "belly chains". [Dkt. 234]

Ps.Ex.559 Teeter Depo, p.103:20-21 (SEALED).   Male and female jail cases were

kept separate from each other in the jail, on transport buses, on the way from buses

to the Cellblock, and in the Cellblock. [Dkt. 233-57] Shealey Depo, p.36:1-3.

Male jail cases were always kept segregated from male lock-ups.  Male jail cases

were not subjected to blanket strip searches, but women were.  Helton/Clifton

interrogatory responses. [Dkts. 251-1, 251-2].

MPD brought each vanload of lock-ups to the basement sally-port with a

"vansheet" (manifest) [Dkt. 233-3] generated from CJIS (MPD's computerized

booking system) lock-up list, [Dkt. 233-72] Gantt Depo, p.64, that listed name,

charge(s), race, gender, PDID number, date of birth, arresting officer, arrest

District, arrest number, warrants, and other data. [Dkt. 233-57] Shealey Depo,

p.83:10-12; [Dkt. 233-71] Holmes CCB Depo, p.19:1-4; [Dkt. 233-81] GAO

Report, p.67, n.18; [Dkt. 233-3] (wristband and vansheet photo); [Dkt. 233-83]

(sample lock-up list from class period).

Deputies could see at a glance an arrestee's name, photo, charge and other

identifying information such as gender and race from the vansheet, the wristband,

and copies of the US lock-up list and Traffic lock-up list deputies printed out of

their CJIS terminals in the Cellblock before the lock-ups arrived. [Dkt. 233-57]

Shealey Depo, pp.76:22-77:8 [Dkt. 233-83] (sample lock-up). Deputies checked

identifying information before taking custody of lock-ups. Deputies wrote "lock-up

numbers" on wristbands for the US cases going into C-10 and a "T" for the D.C.

prosecuted cases going into the Traffic courtroom.  [Dkt. 233-57] Shealey Depo,

pp.83:20-84:1; [Dkt. 233-38] Dillard Depo (Bame), p.106:17-22.  [Dkt. 234]

Ps.Ex.524 Dillard depo. (Johnson), 106:17-22 (SEALED).  MPD general orders on

transporting prisoners obligated transport officers to warn deputies of dangerous

prisoners. [Dkts. 193-4, 193-5].

## 2.    To The Cellblock In Elevators

The Foley diagram [Dkt. 528-6] shows the route male and female jail cases

and arrestees followed as they arrived in the Cellblock and went up the elevators to

their cells. Male jail cases went in belly chains and leg irons and walked straight

off the elevator to cells on the left (W-1, W-2, and W-3),  Id. (orange lines going to

top of diagram); male arrestees walked through metal detectors. Groups of about

ten went to the "male search room" for searches by both male and female deputies.

Id. (orange lines going to male search room at the bottom left of the diagram).

After being searched, males walked to the US lock-up cell or the Traffic lock-up

cell in front of the bubble. [Dkt. 528-6](orange lines leaving male search room at

the bottom left of the diagram and going to 2 orange "Xs").

Women arrestees and jail cases went to the Cellblock with hands bound in

flexi-cuffs, to the female room containing several holding cells located behind a

closed door by the "bubble," Id.  (pink and orange dotted lines), passing through a

metal detector, and having their cuffs cut or shackles removed before entering the

female pod.  [Dkt. 233-57] Shealey Depo, pp.101:20-102:5; [Dkt. 233-31]

Bertrand Depo, p.11:8-14; 13-14; [Dkt. 233-29] Alexander deposition; [Dkt. 234,

235] Alexander diagram Ps.Ex.504-1 (SEALED). The cells inside this room or

"pod" were open so everyone in each cell could see into the others. Id.

Female arrestees were further segregated into Traffic/D.C. charge cells

("traffic lock-ups"), and a US charge cell ("US lock-ups") on the left and jail cases

in cells on the right. All female prisoners were strip searched in the female pod.

[Dkt. 233-31] Bertrand Depo, p.11.

As female arrestees entered the cells, deputies ordered them to turn around,

and in full view of all arrestees, jail cases, and deputies, face the wall, drop their

pants (or raise their skirts) and underwear, and squat and cough while the deputies

observed their bare buttocks and genitals from a few feet away.  [Dkt. 235]

Ps.Ex.504-1, Alexander diagram (SEALED); Ex. # 7; [Dkt 235) Ps.Ex. 550 Julie

Shealey D.Tr., pp.8-10, (SEALED); [233-29] Hargrove Depo,  pp.8-10 (Clifton).

The process was the same for female jail cases. [Dkts. 251-1, 252-2]  Helton

(policy and practice as of 2/21/00); Clifton (policy and practice as of 6/29/01);

[Dkt. 233-57] Shealey Depo, pp.138-39; [Dkt. 233-29] Alexander Depo, pp.8:11-

12, 45:13-16.

All 14 female deputies and DEOs deposed testified that every female

arrestee was strip searched. [Dkt. 243-1] Plaintiffs' objections to defendant's SMF,

¶59, pp.80-85.  Four testified that jail cases also got strip searched, and the rest had

no recollection or were never asked. Id. at 86. This evidence corroborated the

Helton/Clifton interrogatory responses, Mark Shealey's deposition testimony, and

Dillard's testimony as to women.

### 3. Female Arrestees Were Held Separately Until Called Into Presentment Courtrooms.

After being searched in the female pod, female arrestees were taken to

interview rooms outside the presentment courtrooms (C-10 for US lock-ups,

Traffic courtroom for Traffic lock-ups), [Dkt. 233-57] Shealey Depo, p.213:13,

and held there with other female lock-ups apart from other prisoners until they

were called into the presentment courtroom.  Id. at 47:4-15; [Dkt. 234] Ps.Ex.552-1

(Shealey's diagram showing female interview room) (SEALED); [Dkt. 233-18]

Muhammad Depo, p.57:4-5; [Dkt. 233-19] Holloway-Summers Depo, p.28:19-24.

Arrestees ordered released at presentment were released directly from the

presentment courtrooms. [Dkt. 233-57] Shealey Depo, pp.35:3; 142:1-11; [Dkt.

243-1] opposition to defendant's SMF # 2 and # 4.

### 4.    The Vast Majority Of Female Arrestees Were Released At Presentment.

About 30% of all US cases are no-papered (i.e., charges are dropped) at presentment, and about 5% to 8% of all D.C. cases are no-papered. [Dkt. 233-81] GAO Report, The "vast majority of US misdemeanor" defendants were released at presentment in C-10.  Id. Most D.C. Traffic lock-ups whose cases were not no-papered were also released at presentment, either on PR, diversion programs or "post & forfeit." Id.  See [Dkt. 233-4] Kriegler Declaration, Table 2, ¶14 (indicating that at least 36% of all female arrestees across the board were no-papered at presentment; at least 51% of all female arrestees booked on US felony charges were no-papered; at least 55% of female arrestees booked on misdemeanor or felony drug/weapon/violence charges were no-papered).

**All told, virtually four out of five female arrestees presented in Superior Court were released from the courtroom**.  Id.; [Dkt. 233-1] Plaintiffs' motion for partial summary judgment, p.6, n.6.  Five of the six named plaintiffs were released from the courtroom at presentment.  Id.,Chart, p.5

About 4,500 women, arrested on minor charges and almost guaranteed to be released at presentment, were strip searched during the class period. [Dkt. 233-4] Kriegler Declaration, ¶15 (Table 2 - percentage of women arrestees no-papered, by charge).

### 5.    Group Searches.

Dillard knew women were subjected to group searches in groups of three to six because he watched them arrive in groups to be searched in the female search room. [Dkt. 234, 235]  Ps.Ex.524 Dillard (Johnson) Depo, p. 94:11 (SEALED).

## SUMMARY OF ARGUMENT

The Supreme Court in <u>Florence</u> confirmed the consensus of Circuit cases which long held that strip searching pre-presentment arrestees arrested on minor charges and held outside the general population, especially strip searching women only, violates the Fourth Amendment. The District Court erred  by granting Dillard summary judgment on plaintiffs' Fourth Amendment claim.

The District Court erred by holding the District not liable for the Superior Court Marshal's unconstitutional strip search policies because: (1) the Marshal is part of the organic government of the District and acted as a  District policy maker, and (2) the District entrusted the Marshal with its arrestees when it knew or should have known  that he would subject them to blanket strip searches.

The Marshal's practice of strip searching female, but not male arrestees, prior to presentment because females have an extra orifice in which to conceal contraband, violates Equal Protection. The District Court erred in granting summary judgment on the basis of insufficient evidence of discriminatory intent, as a matter of law, where there is ample evidence in the record below including

depositions and interrogatory responses, from which inferences should be drawn in plaintiffs' favor that the Marshal intended women-only strip searches.

Finally, <u>Bame</u> does not entitle Dillard to qualified immunity because: (1) <u>Bame</u> did not address the effect of the <u>Morgan</u> Order, a 1981 injunction specifically prohibiting strip searches of pre-presentment women arrestees held outside the general population; (2) and the record contains substantial evidence showing the Marshal's practices were an exaggerated response to problems of jail security, e.g. women arrestees were segregated from other prisoners.

## ARGUMENT

## V. STRIP SEARCHES OF WOMEN ARRESTEES LIKELY TO BE RELEASED VIOLATED THE FOURTH AMENDMENT.

### a. *THERE IS NO SOUND PENOLOGICAL REASON TO CONDUCT BLANKET SUSPICIONLESS STRIP SEARCHES ON ARRESTEES*

#### i. *<u>Florence</u> factors not present*

The "specific dangers" which Justice Kennedy stated, in general, provide justifications for blanket strip searches of persons admitted to the general population of a detention facility boil down to intercepting contraband, discovering lice and other contagions and wounds on the prisoner, and identifying gang members by tattoos and other markings. <u>Florence</u>, 132 S.Ct. at 1518. None are present here.

First, women arrestees were never introduced into a general population. Moreover, as explained below, there was no significant contraband problem and, even if there were, blanket drop, squat, and cough searches were not effective at finding it. Roberts v. State of R.I.,[9] 239 F.3d 107, 112 (1st Cir. 2001). Moreover, neither lice nor gangs were a problem in the Cellblock and drop, squat, and cough searches were not effective at discovering lice or wounds or identifying gang members. Id.

Justice Kennedy also worried that classifying inmates by current and prior offenses before the intake search might be difficult because officials know so little about people they admit at arrival. Florence, at 1521. Here, arrestees arrived fully identified, and deputies classified them at arrival into US and Traffic lock-ups. See Section IV above. Moreover, arrestees would not be efficient at "muling" contraband because their hands were flexi-cuffed. Most were released at presentment from the courtroom so they could not "mule" contraband to the DC Jail. Id.

### ii.  Arrestees Already Searched Prior to Presentment

Following arrest, women came to the Cellblock from MPD stations, substations, traffic stations, or Central Cellblock for presentment.

---

[9] Grant of qualified immunity affirmed on other grounds by a divided en banc Court of Appeals sub nomine, Savard v. Rhode Island, 338 F.3d 23, 33-4 (1st Cir. 2003).

MPD searched arrestees upon arrest, again at the MPD facility, and again before transport.  Female arrestees were held by themselves in interview rooms behind the courtrooms until presentment.  See Section IV.A., supra.

Arrestees were not commingled with jail cases or Lorton prisoners.  Section IV.B., supra.  The trial court noted, "a significant portion, if not the majority, of female arrestees were typically released from custody immediately from the courtroom in which they were arraigned without having to return to the cellblock." [Dkt. 272] Memorandum Opinion, pp.9-10.

### iii.     Female Arrestees Do Not Present Contraband Risks Justifying Drop, Squat and Cough Searches

#### 1.     Defendant's own records of contraband finds do not support blanket squat and cough searches

The incident reports submitted by Dillard show women brought contraband into the Cellblock in their vaginas or vaginal areas only twice in 10 years and, in each case, a pat-down alerted the searching deputy first. [Dkt. 243-1] Plaintiffs' Opposition to Defendant's SMF ("SMF"), ¶30, pp.42-44; [Dkt. 245] Ps.Ex.805 (spreadsheet of incidents) (SEALED).  Therefore, blanket strip searches were not effective at finding contraband.  Even a lengthy history of contraband at a facility, lacking here, does not justify a particular search if the search is ineffective in discovering or deterring contraband. Roberts, 239 F.3d at 112.

The USMS says deputies subjected all females to strip searches, but not males, was [1] "[P]rimarily because of the history of the discovery of contraband and weapons hidden in the vagina of women who arrive in the Superior Court Cellblock from the District of Columbia Jail or the MPD, and [2] because of the relative ease with which contraband or weapons can be secreted in the vagina or sanitary napkins."  [Dkts. 251-1, 251-2] Interrogatory response #8, Helton/Clifton; [Dkt. 233-57] Shealey Depo, pp.122:16-22; 123:9-11; 159:3-17.  Any other reasons given for justifying blanket strip searches of female arrestees were advanced by Dillard's attorneys, not by him or his staff, and thus are not entitled to the "deference" due decisions of prison officials (not their lawyers).  Bame, 637 F.3d at 385, citing Bell v. Wolfish, 441 U.S. 520, 559-60 (1979).

The data does not support USMS' reasons.  Any contraband flow that may have originally justified strip searches had dried up by the start of the class period. [Dkt. 234, 235] Ps.Ex.522 Cotton Depo, pp.58:5-22; 59:1-21 (most contraband stopped coming into the cellblock around 2000), p.217:6-10 (amount of contraband dropped off in last 2 or 3 years), p.210:7-22 (Shealey still the Cellblock supervisor when Cotton left on 3/30/2002), pp.9:1-3, 257:8-21 (Cotton says blanket strip searches of male lock ups stopped around 2000-2001). (SEALED)

19

Moreover, Shealey had metal detectors set to pick up slivers of metal so strip searches were not needed to detect weapons, [Dkt. 233-57] Shealey Depo, p.232:10-11, the only security threat Shealey recognized. Id. at p.244:13-18.

Three deputies testified that they never discovered contraband during a strip search of a woman.  [Dkt. 233-29] Alexander Depo, p.4:14; [Dkt. 233-39] James-Smith Depo, pp.101:2-102:3; and [Dkt. 233-63] Zisch Depo, p.41.  Zisch also testified that she never saw any other deputy find contraband on a woman prisoner during a strip search.  Id. at p.45.  Three other deputies reported finding contraband during pat downs of female prisoners, but not during strip searches.  [Dkt. 233-31] Bertrand Depo p.17:7-11; [Dkt. 233-49] Knox Depo pp.19-20:15-7, and [Dkt 233-58]  Seifert Depo p.67:8-11.  One testified that she found a cigarette butt in a woman's panties, and a donut in another woman's panties.  [Dkt. 233-46] Jeanmarie Depo, p.103:2-1.

None of the incident reports [Dkt. 232-3] Dillard produced that describe incidents of contraband found on females during the class period describes an item found as a result of strip searches.  For ease of reference and discussion, plaintiffs filed copies of these incident reports [Dkt. 232-3] with numbers at the bottom as [Dkt. 245] Ps.Ex.804, a list of the unique incident reports [Dkt. 235] Ps.Ex.187, and a spreadsheet chart summarizing contraband found, [Dkt. 245]. Ps.Ex.805 (ALL SEALED) is a spreadsheet showing data from incident reports with

references to page numbers plaintiffs added in the first column and the Bates

numbers in the second column.  Reports relating to women are highlighted in

mauve, to men in blue, and to juveniles in green.  Reports in green and blue should

be eliminated as they do not relate to women, but to men and juveniles.  Men were

always separated from women; juveniles were not even in the same part of the

courthouse.

Some incidents provided are fanciful.  For example, Bates 000354-000355,

attached as [Dkt. 234] Ps.Ex.401 (SEALED) describes an item recovered from the

backpack of a non-prisoner visitor whose backpack was X-rayed in the lobby of

the courthouse.  Many incidents on defendant's list describe items recovered from

juveniles or hospital prisoners, and merely serve to inflate statistics on what

purports to be a list of incidents in which contraband was found on women at the

Cellblock.

A careful analysis of the incident reports shows (1) a limited amount of

contraband found on women; and that (2) it was not found during strip searches.

[Dkt. 245] Ps.Ex.805. (SEALED)

After eliminating reports not involving recovery of contraband from adult

women, [Dkt. 234], Ps.Ex.410 (SEALED) only about 12 incident reports involving

recovery of contraband from female prisoners (jail cases as well as arrestees)

21

during the class period (12/2/99 to 4/30/1003) and a total of 22 incident reports overall remain.

Of the 12 contraband incidents in the class period, no item was found as a result of suspicionless strip searches. Contraband was found one time in a strip search, but only after the deputy first felt the item in a woman's crotch after conducting a pat-down. [Dkts. 234, 235] Ps.Ex.187, 000276 magnometer alerted, 000291, [Dkts. 234, 235] Ps.Ex. 404; search of a woman's purse and fanny pack, 000294; six times during pat-downs, 000244, 000278, 000299, 000298, 000356, and 000395; and on two other occasions but the reports do not specify how, 000345, 000347. (SEALED)

Eighteen of 27 reports of contraband removed from a female prisoner were recovered from the purse, shoes, or clothing, not from a strip search. [Dkt. 245] Ps.Ex. 805 (spreadsheet showing incident reports relating to females in pink). (SEALED) Not one of the 27 reports regarding females describes a situation where drugs, weapons or other contraband was found as the result of a strip search. Two (highlighted in orange) indicate that items were found in the "vaginal area" or the "vagina," pages[10] 51 and 139 respectively. However, there was reasonable suspicion, and the officer was alerted based on clearly observable circumstances.

---

[10] Page numbers refer to page numbers added to defendant's incident reports [Dkt. 232-3] with numbers at the bottom [Dkt. 234] Ps.Ex. 804 (SEALED)

In one, an "envelope with papers, puzzles, personal letters, soap" was found in the "vaginal area" of a CTF prisoner (not an arrestee). Given that description, these could not have been found in the vagina itself. p.139. The other report, describing contraband found in the "vagina", explained that the searching officer felt an item between the woman's legs during a pat-down, and on that basis performed a strip search, p.51. One was found in 2007, the other in 2002. In the four years immediately following the end of the class period there was not a single documented incident of contraband found on a female prisoner of any kind, indicating that pat-downs revealed a decline in contraband after the policy stopped.

### 2. Strip Searches Were Unnecessary For Court Security.

Dillard's attorneys claim protection of judges and other courthouse personnel justified women-only strip searches, but they do not explain why court security did not also require strip searches of men. [Dkt. 232-1]Dillard's summary judgment motion , p.19.  Apparently Chief Deputy Rowe did not share this concern because as for the type of searches used in the Cellblock, he "Never gave it any thought."  [Dkt. 234] Ps.Ex.549 Rowe Depo (Johnson) p.135 (SEALED).  Deputy Foley (on whose affidavit Dillard relied in Bame) testified that, based on his experience in other urban federal courthouses (e.g. Atlanta), strip searches were unnecessary to maintain security in the Cellblock. [Dkt. 233-43] Foley Depo, p.106:10-24. [Dkts. 251-1, 251-2] USMS' Helton/Clifton interrogatory responses

and Cellblock supervisor Mark Shealey, supra, say the reason for strip searches was that women have two orifices whereas men have only one. Moreover, female lock-ups were held in interview rooms by themselves behind the presentment courtrooms. [Dkt. 233-57] Shealey 47:4-15; [Dkt. 235] Ps.Ex. 552-1 (Shealey diagram) (SEALED); [Dkt. 233-18] Muhammad Depo, p.57:4-5; [Dkt. 233-19] Holloway-Summers Depo, p.28:19-24.

### 3. Transporting Arrestees in Groups Does Not Justify Strip Searches

Dillard contends that blanket strip searches were needed because the MPD transported women in groups without segregating them by level of charge. First, MPD transported males in the same way, but Dillard did not strip search every male. [Dkts. 251-1, 251-2] Helton/Clifton interrogatory responses# 8. Descriptions of how MPD handles arrestees from point of arrest to delivery to the Cellblock with citations to the record appear at plaintiffs' objections to Dillard's SMF, numbers 5,6,7,8 and 22. [Dkt. 243-1]. Second, Shealey testified that transport in groups did not pose a security concern. [Dkt. 233-57] Shealey Depo, p.82:2-12. Moreover, two of the four Justices on the Florence Court, Justices Roberts and Alito, wrote separate concurrences on why a different rationale would govern a case involving pre-presentment arrestees arrested on minor charges held outside the general population. Neither adopted the "substantial contact" test mentioned in passing by Justice Kennedy. Justice Alito did not believe that arrestees

24

intermingling with each other, as opposed to being placed into the general population, supported blanket strip searches of pre-presentment arrestees arrested on minor charges because he cites with approval two systems – the Bureau of Prisons and the San Francisco sheriff's office – in which jailors do not strip search pre-presentment arrestees arrested on minor charges who have contact with each other outside the general population.  132 S.Ct. at 1524 and n.*.

Finally, to the extent security concerns were not addressed by the foregoing procedures, MPD also positively identified arrestees using LiveScan and AFIS, ran local and national criminal information database checks, and made the information available to defendant, the Marshal's Office and the searching DEOs and deputies. MPD thus provided vast amounts of arrestee information from point of arrest to delivery to Superior Court. Sections IV.b. & IV.c.1., *supra*.

### iv.     Almost Eighty Percent of Female Arrestees Were Released From the Courtroom

As stated earlier, four out of five female arrestees were released directly from the courtroom, and thus never commingled with the general population. Section VI.2., supra. Five of the six named plaintiffs were released from the courtroom at presentment. Id.

### b.     BLANKET SUSPICIONLESS STRIP SEARCHES OF ARRESTEES LIKELY TO BE RELEASED VIOLATES THE FOURTH AMENDMENT

The combined concurring and dissenting opinions in <u>Florence</u>, 132 S. Ct. 1510, confirm the holdings of the consensus of cases in the Circuits that the Fourth Amendment prohibits blanket strip searches of those arrested on minor charges. <u>Logan v. Shealey</u>, 660 F.2d 1007 (4th Cir. 1981)(strip search of woman arrested on minor offense and not placed in general population while waiting briefly for friend to bring bail held unconstitutional because no justification); <u>Mary Beth G. v. Chicago</u>, 723 F.2d 1263, 1273 (7th Cir. 1983) (strip searches of female arrestees but not males in police lock ups without general populations not reasonable because practice undercuts justification rationale of discovering and deterring contraband by applying to only some arrestees); <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 871 (9th Cir.1993). These cases, and many others like them, all recognized that, under the <u>Bell</u> balancing test, pre-presentment arrestees arrested on minor charges should be treated differently from pretrial detainees held in the general population of a detention facility, because, unlike pretrial detainees, they were likely to be released very quickly after being brought to the detention facility. These courts knew what Justice Alito knew when he wrote in his concurrence in <u>Florence</u>: "Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a

26

magistrate. In some cases, the charges are dropped. In others, arrestees are released either on their own recognizance or on minimal bail." Florence, 132 S.Ct. at 1524. No Circuit, including this one, has ever held that the Fourth Amendment permits blanket strip searches of arrestees arrested on minor charges likely to be released at presentment.  Nor has any court anywhere in this country ever upheld a policy of blanket strip searches of women arrestees arrested on minor charges, but not men, solely because women, but not men, have two orifices which the USMS and Dillard implemented in the Superior Court.  [Dkts. 251-1; 251-2]  Helton/Clifton interrogatory responses # 8;  Helton, 191 F. Supp. 2d at 185 (holding that USMS' women-only strip search policy violates District of Columbia law and stating it also violates Fourth Amendment).

These cases also recognized that the application of the Bell balancing test by the Bell Court to the pretrial detainees in that case depended significantly on the fact that the pretrial detainees were held in the general population.  Bull v. City and County of San Francisco, 595 F.3d 964, 981 (9th Cir. 2010) (en banc) also supported the view that placement in the general population was outcome dispositive in Bell because the Bull Court expressly limited its holding to persons held in the general population of a county jail.  In fact, the Bull Court expressly held that a case holding unconstitutional the blanket strip searches of pre-presentment arrestees arrested on minor charges by deputy marshals at a federal

district court courthouse violated their Fourth Amendment rights. <u>Bull</u>, 595 F.3d at

981 <u>citing</u> <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 871 (9th Cir.1993). <u>Powell</u>

<u>v. Barrett</u>, dealt only with pre-presentment arrestees arrested on minor charges

placed in the general population while awaiting their initial appearances, and is

thus distinguishable on its facts regardless of any <u>dicta</u> in the case to the effect that

<u>Bell</u> applies to all parts of a detention facility, not just the general population of a

detention facility. 541 F.3d 1298, 1300 (11th Cir.2008) (<u>en</u> <u>banc</u>).

The <u>Florence</u> Court thus applied the <u>Bell</u> balancing test to intake searches

using two of the most fundamental elements of the <u>Bell</u> Court's analysis: (1) the

importance of the release status of the person subjected to a strip search, which

incorporates how the severity of charge is a predictor of release; and (2) the

significance of general population to the security of a detention facility, and thus to

outcome in the <u>Bell</u> balancing test. <u>Bell v. Wolfish</u>, 441 U.S. at 547 n.28.

The <u>Bell</u> plaintiffs were pretrial detainees denied release in a system weighted

towards pretrial release. <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 n.28 (1979). Thus, the

<u>Bell</u> analysis applies, but the <u>Bell</u> result does not.

Plaintiffs here fit the rule in <u>Florence</u> espoused by Justice Alito and the four

dissenters perfectly. Plaintiffs are arrestees arrested on minor charges, and 80% of

them were released at presentment directly from the courtroom.

28

Bame does not control plaintiffs' Fourth Amendment claim because plaintiffs' Fourth Amendment claim is distinguishable from Bame, which addressed the qualified immunity issue. First, Dillard's policy and practice was to subject women, but not men, to blanket strip searches because, according to testimony and interrogatories response by the USMS in a pair of similar cases, women have vaginas which can be used to secrete contraband. [Dkts. 251-1, 251-2] Helton/Clifton interrogatory responses, #8.

The Bame panel held that the record in Bame substantiated Dillard's point that Superior Court had a persistent problem with contraband being smuggled into the cellblock, and that fact justified blanket strip searches of all arrestees pursuant to subsection (f) of Policy Directive No. 99–25. 637 F.3d at 387. However, plaintiffs' case is distinguishable from Bame on this point as well, as plaintiffs demonstrated above. [Dkt. 245] Ps.Ex.805 (spreadsheet analyzing incident reports) (SEALED). In plaintiffs' case, Dillard testified that he knew nothing about Policy Directive No. 99–25. Moreover, several deputies, including one supervisor, testified by deposition that any contraband problem that may have existed in the Superior Court cellblock had evaporated by 1999 or 2000. E.g. Tyrone Cotton says most contraband stopped coming into the cellblock around 2000, [Dkt. 234, 235] Ps.Ex522 Cotton Depo, pp.58:5-22; 59:1-21 (SEALED), or maybe the year before that, p.217:6-10. Moreover, deputy Mark Foley testified

29

that the Superior Court Cellblock did not require strip searches to maintain security

in that cellblock.  [Dkt. 233-43] Foley Depo, p.106:10-24.

The Cellblock is a lock-up in a municipal courthouse with no general

population with housing units like the general population area of a county jail.

Plaintiffs' Notice, [Dkt. 271] at p.10.  The Superior Court Cellblock has no

housing units, or common areas, or non-attorney contact visitors from outside the

facility, or any other attribute of a general population. Id.

There were no common areas where they could watch TV or visit with

neighbors in other cells, or visit with persons from outside the facility except for

attorney visits **after** the strip searches.  No outside persons made any deliveries to

the Superior Court Cellblock of food or other items needed to maintain a prison

population.  Id.

Deputies searched the Cellblock for contraband each night after the last

prisoner left, and they searched it again in the morning before the first prisoner

arrived.  Id.

**In fact, female arrestees went straight from transport vans, to the**

**female pod, to the interview rooms** segregated from other prisoners **where they**

**remained until presentment in either C-10 or the traffic courtroom.**  [Dkt.

233-57] Shealey Depo., p.47:4-15; [Dkt. 234, 235] Ps.Ex.552-1 (Shealey's

diagram showing female interview room) (SEALED); [Dkt. 233-18] Muhammad

Depo, p.57:4-5; [Dkt. 233-19] Holloway-Summers Depo, p.28:19-24.  Arrestees

ordered released at presentment were released directly from the presentment

courtrooms. [Dkt. 233-57] Shealey Depo, pp.35:3; 142:1-11.

Finally, the "deterrence" justification identified by Bell and Florence is not

present in this particular case because, according to the Helton/Clifton

interrogatory responses, the target population (female arrestee/lock-ups) did not

know about the strip search policy.  By definition a strip search policy has a

"deterrence" effect only if the target group knows about the policy.  In prisons,

administrators have to take steps to publicize their search practices to achieve

deterrence effect.  [Dkt. 271-1] "Reducing drugs and alcohol in prisons" by John

M. Vanyur, Ph.D. and J.T. O'Brien. p.2. Dillard contends the policy in the

Cellblock was so secret even he did not know what it was.

## VI.    THE DISTRICT IS LIABLE FOR THE SUPERIOR COURT MARSHAL'S STRIP SEARCHES OF ITS ARRESTEES

Plaintiffs had three independent, alternative theories for making the District

liable for the Superior Court Marshal's unconstitutional strip searches of the

District's pre-presentment arrestees: (1) the "organic" theory (the Superior Court

Marshal is part of the organic government of D.C. and acted as a D.C. policy

maker); (2) the "joint actor" theory (even if not part of the organic D.C.

government, the Superior Court Marshal acted in concert with a D.C. agency); and

(3) the entrustment theory (D.C. entrusted the Superior Court Marshal with

31

arrestees when it knew or should have known that they would be subjected to unconstitutional strip searches).  [Dkt. 194-1] Opp. to SJ Mtn.

In this appeal, plaintiffs pursue only the organic and entrustment theories.

### a. *ARRESTEES WERE DISTRICT PRISONERS SUBJECT TO DISTRICT LAWS*.

Plaintiffs were District prisoners; arrested on District Code offenses; pursuant to arrest authority granted by a District warrant (DC Code §23-562, requiring persons arrested on warrants to be presented before a Superior Court judge), or statute (D.C. Code §23-581, same for warrantless arrests); brought to Superior Court mainly by MPD officers; by virtue of District Superior Court Crim. Rule  5; for presentment to District judicial officers; in the District courthouse Id. Only the Superior Court (D.C. Code §23-1110, authorizing the Superior Court to appoint MPD station officers as clerks of court to accept bond or collateral set by schedule established by the Superior Court or by citation) or the MPD (D.C. Code §5-335.01, "post and forfeit") can effect their release before presentment. Following arrest, the Superior Court controls all steps in the process through presentment and release or detention under DC Code §§23-1321 et seq.

### i. Pre-presentment Arrestees Are In District Custody, And No Law Mandates That MPD Deliver Arrestees To Superior Court Marshal.

No statute or rule requires the District to hand off its arrestees to the Superior Court Marshal at the cellblock.  The statutes and rules referenced in

previous paragraphs require arrestees to be brought before Superior Court, not the Superior Court Marshal. Congress created the office of the United States Marshal for the Superior Court of the District of Columbia in 1988, 28 U.S.C.A. §561(c), discussed below, but Congress did not assign any powers or duties to the Superior Court Marshal in the Act or anywhere else. Thus, the Superior Court Marshal's power flows from Superior Court. Nor did Congress mandate the District to deliver its pre-presentment arrestees to the Superior Court Marshal. In fact, the statute governing the US District Court Marshal's relations with Superior Court before Congress created the office of the Superior Court Marshal obligated the District Court Marshal to "serve" the Superior Court, **not** <u>vice</u> <u>versa</u>. D.C. Code §11-1729.

D.C. Code §24-201.13 (commitment by Marshal to D.C. Jail) and D.C. Code §24-201.14 (delivery of prisoners to Marshal by D.C. Jail) apply only to prisoners the District Court Marshal, **not** the Superior Court Marshal, commits to and receives from the D.C. Jail and CTF for court appearances. Thus, they do not apply to pre-presentment arrestees. These arrestees did not go to the D.C. Jail before presentment, [Dkt. 233-81] GAO Report, pp.66-67; [Dkt. 233-57] Shealey pp.24-27, so D.C. Code §24-201.14, requiring the warden of the D.C. Jail to deliver his prisoners to the District Court Marshal (**not** the Superior Court Marshal) does not apply to plaintiffs.

33

### b. ENTRUSTMENT THEORY LIABILITY.

Since no law required the District to deliver arrestees to the Superior Court Marshal, the District is liable for injuries to its arrestees caused by the Superior Court Marshal's strip searches of women arrestees because the District knew or should have known about the strip searches, regardless of the District's control or lack of control over the Superior Court Marshal.  Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004); Deaton v. Montgomery County, 989 F.2d 885, 888-90 (6th Cir. 1993).  The basis of these "entrustment liability" cases is a line of Supreme Court and D.C. Circuit cases holding that when the government takes a person into custody, and/or otherwise removes his ability to protect himself, the government assumes an affirmative duty to protect him.  See, e.g., Estelle v. Gamble, 429 U.S. 97 (1976); Whitley v. Albers, 475 U.S. 312, 318-319 (1986); Hudson v. McMillian, 503 U.S. 1 (1992); County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998); Women Prisoners of the D.C. Dep't of Corrections v. District of Columbia, 93 F.3d 910, 928 (D.C. Cir. 1996); Daskalea v. District of Columbia, 227 F.3d 433, 450 (D.C. Cir. 2000).

It does not matter if the transferor has no control over the facility in which it places its prisoners.  Warren, 353 F.3d at 39 (liability attaches if "a District custom or policy caused the claimed violations of [plaintiffs'] constitutional rights").  The District is liable, not for the actions of Dillard, but for its own deliberate

indifference in continuing to deliver its arrestees to Dillard when it knew or should have known of his illegal strip search practices.  Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

### i.  The District Had A Duty To Monitor The Strip Searches.

Because the Morgan Order prohibited the District from subjecting female arrestees to blanket strip searches in any District lock-up or jail [Dkt. 68-1] Morgan Order, the District had an affirmative duty to monitor Dillard's strip searches of arrestees in the Cellblock, and either challenge illegal strip searches, stop delivering its arrestees to  him, or assume the function of presenting arrestees in Superior Court as it assumed[11] the functions of transporting jail cases between the courthouse and the jail, and running the "jail desk" in the Cellblock. District of Columbia Criminal Justice Coordinating Council, 2008 Annual Report, p.5, 29 (DOC assumed responsibility of jail board operations, which coordinate paperwork from deputies regarding jail cases).

 http://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/publication/attachments/CJCCAR 08.pdf last checked 10/10/2012

### ii.    In Any Event, The District Had Actual Or Constructive Knowledge Of Dillards' Strip Search Practices.

---

[11] Transcript of confirmation hearing of Stephen Conboy who succeeded Dillard as Superior Court Marshal.  http://www.gpo.gov/fdsys/pkg/CHRG-109shrg30596/html/CHRG-109shrg30596.htm (last checked 10/9/12).

The District had actual or at least constructive knowledge of the Superior Court Marshal's strip search practices through lawsuits filed in District Court on February 20, 2001, <u>Helton v. United States</u>, 01-385 (JDB), and March 26, 2002, <u>Clifton v. United States of America</u>, 02-578 (JDB), both of which challenged the policy of subjecting women arrestees but not men to blanket strip searches. <u>Deaton</u>, 989 F.2d at 890 (filing of complaint gives notice of strip searches in transferee facility and continued transfer in face of notice amounts to deliberate indifference); <u>Kline v. 1500 Massachusetts Ave. Apartment Corp.</u>, 439 F.2d 477, 479 (D.C. Cir. 1970) (police reports of crimes occurring in apartment constituted constructive notice to landlord sufficient to create duty to protect his tenants). Likewise, the District Court's opinion in <u>Helton v. United States</u>, 191 F. Supp. 2d 179, 185 (D.D.C. 2002), published March 21, 2002, holding that the <u>Helton</u> plaintiffs stated a claim under District of Columbia common law right to privacy gave the District constructive notice.

The District had actual notice by 10/02/2002 because the District cited to Judge Bates' <u>Helton</u> opinion in its reply to plaintiffs' opposition to the District's motion to dismiss the Second Amended Complaint filed in <u>Bynum v. District of Columbia</u>, 02-956 (RCL), Document #24, filed 10/2/2002. Moreover, the District had actual notice of the Superior Court Marshal's strip search practices as of 11/27/2002 when Ms. Julie Abbate described the strip searches to the MPD Civil

36

Rights and Force Investigations Division, , [Dkt. 233-95]. MPD Report on IMF

Protest Mass arrests p.7.  Finally, the District received actual notice when plaintiffs

served the complaint in this case shortly after filing on 12/02/2002.  See District

motion for extension of time to answer complaint, filed 12/23/2002 [Dkt. 3].  The

women-only strip searches did not stop until 4/28/2003 at the earliest. [Dkt. 24, ¶2]

### iii.  The District Is Liable Under The Entrustment Theory.

As a *general* rule, Deaton, 989 F.2d at 890, and Warren, 353 F.3d at 39,

require actual or constructive knowledge by the transferor of the transferee's

conduct based on obviousness or a longstanding practice in the absence of a duty

to monitor for liability to attach. Here, the District both had such knowledge and

was under a court ordered obligation to ensure that strip searches at issue here did

not occur. Nonetheless, the District did nothing to protect plaintiffs' rights.

**Having custody of a person, or being responsible for their safety even in**

**the absence of custody, creates an affirmative duty, which is not satisfied by**

**doing nothing**.  Farmer v. Brennan, 511 U.S. at 842-843; Butera, 235 F.3d at 651.

When a government entity has actual or constructive **knowledge** of an ongoing

unconstitutional policy or custom of those for whom it is responsible, and takes no

steps to stop or avoid them strip searches, it acts with deliberate indifference to the

rights of those for whom it is responsible.  Baker, Warren, and Deaton, supra.

_Deaton_ is especially instructive. There, Montgomery County entered into a contract with the City of Dayton for the City to operate the County's jail ("DHRC"). 989 F.2d at 886. Plaintiffs were County arrestees transferred from County custody to the DHRC and subjected to its policy of illegal booking strip searches. Id. Plaintiffs' theory that the County was liable for the City's strip searches at DHRC because the County failed to require in the contract that the City follow the law was rejected. Both the County and City had an equal obligation to follow the law. Id. at 889-890.  The County did not have an affirmative obligation to discover that the City engaged in illegal strip searches.  There was no evidence that the County was on notice of the practice until plaintiffs filed suit, after which "defendants were then on notice that the City may not be in compliance with state law and any inaction by the County after this point might make a case for deliberate indifference giving rise to a claim under §1983." Id. at 890.

The Johnson plaintiffs have supplied the fact missing from the Deaton case (and the one supplied in Warren), i.e., District knowledge of the strip searches (through the affirmative duty imposed by the Morgan order, and the Helton/Clifton cases, Bynum, Ms. Abbot's testimony, and its own acknowledgments in court papers), which gave rise to a duty to protect the constitutional rights of its arrestees and supplied the elements to establish causation.

This theory of liability does not depend upon the allocation of authority among the District, Dillard or the Marshal's Service, or a contractual relationship, but depends upon the rule that local governments bear responsibility for injuries they cause, <u>Collins</u>, 503 U.S. at 120; <u>Baker</u>, 326 F.3d at 1302.

### iv.  The District Court's Ruling On The District's Liability Under The Entrustment Theory Is Wrong

The District Court held the District cannot be held liable under the entrustment theory because it has no authority to control the Superior Court Marshal, and no choice but to turn over its arrestees to the Superior Court Marshal. <u>Johnson v. Government of District of Columbia</u>, 584 F.Supp.2d 83, 92-93 (D.D.C. 2008) (granting summary judgment to District). The District Court's holding incorrectly conflates the entrustment theory with the agency theory and was founded on the erroneous premises that (1) "the authority of the Superior Court Marshal, like every other United States Marshal, logically and expressly derives" from 28 U.S.C. §§561-566, including §566(e)(1)(A), which provides, <u>inter alia</u>, for protection of "Federal jurists" and "court officers" and to prevent "criminal intimidation" because District Superior Court judicial officers are "court officers" within the statute (584 F.Supp.2d at 90), the Director of the Marshal's Service exercises authority over the Superior Court Marshal <u>Id</u>., and "no detained person can be presented to a Superior Court judge without passing through the hands of the Superior Court Marshal."  <u>Id</u>. at 93.

Regarding the District Court's analysis, the phrase "court officers" is obviously limited by the adjective "federal" which precedes "jurists" in the federal system, and the Superior Court judicial officers are not in the federal system. See Palmore v. United States, 411 U.S. 389, 390 (U.S. 1973); Jenkins v. Washington Convention Center, 236 F.3d 6, 10 (D.C. Cir. 2001); D.C. Code §11-101 (Judicial power). Superior Court officers are "jurists," not "officers", under the D.C. Code. The District Court's expansive construction of "court officers" to include Superior Court judicial officers would make the USMS responsible for protecting all "court officers" across the nation in every state, county and municipal court.  Conversely, the District Court's construction would give the Superior Court Marshal the same powers and duties with respect to federal "officers" as the District Court Marshal has.

Further, no statute or ordinance requires that the District turn arrestees over to the Superior Court Marshal. D.C. Code §§24-201.13 and 24-201.14, relied on by the District Court, simply do not apply to arrestees, the District as an entity, the Superior Court, or the Superior Court Marshal. Enacted in 1901, they apply to the District Court Marshal and to the warden of the jail. Rather, the Superior Court controls the disposition of pre-presentment District arrestees from the point of arrest (D.C. Code §23-562), until their release or detention at presentment by a

Superior Court judicial officer (D.C. Code §23-1322(b) and (g) et seq.). See discussion in §VI(B)(1) above.

The District Court ruled that the District was not liable under any species of the entrustment theory because "[i]mplicit in that theory is that the entrusting entity 'had a choice over whether to follow the challenged course of action,'" Jones v. Murphy, 470 F.Supp.2d 537, 553 (D.Md.2007); no detained person can be presented to a Superior Court judge without passing through the hands of the Superior Court Marshal (relying on D.C. Code §§24-201.13 and 24-201.14), Id. at 93; and so the District has no other alternative but to turn over its arrestees to the Superior Court Marshal. Id.

As stated above, D.C. Code §§24-201.13 and 24-201.14 are inapplicable to arrestees. Moreover, Jones is distinguishable because, unlike here, (1) the state statutes there effectively obligated the Baltimore PD to take its arrestees to the Baltimore Booking Center for booking and presentment; (2) no statute imposes a requirement to deliver arrestees to the Superior Court Marshal on the District, the MPD or the Superior Court, the only District agencies that have custody of arrestees up to and including presentment; (3) the Morgan Order [Dkt 68-1] prohibited the District from strip searching arrestees in jails or lock-ups such as the Superior Court; and (4) Warren and Baker, controlling precedent in this Circuit, mandated application of the entrustment theory, whereas there was no 4th Circuit

41

precedent in <u>Jones</u>.  D.C. Code §§24-201.13 and 24-201.14 apply to the District

Court Marshal and the warden of the jail, but arrestees do not go to the D.C. Jail

prior to presentment, if then. Thus, these statutes do not apply to pre-presentment

arrestees.

 No exclusivity clause is contained in 28 USCA §561(c).  Were the District

**required** to take all arrestees to the Superior Court Marshal by federal law, it

would not have power to release arrestees by citation or bond, D.C. Code §22-

1110, or by "post and forfeit," D.C. Code §5-335.01.  The only sources of law

requiring arresting officers (of any agency, including Marshals) are District of

Columbia laws, <u>e.g</u>. DC Code §23-562; DC Code §23-581; DC SCR-Crim. Rule

5(a).  Moreover, the statute governing the District Court Marshal when he handled

D.C. arrestees required that Marshal to "serve" the Superior Court; it did not

require the Superior Court to deliver its arrestees to the Marshal.  D.C. Code §11-

1729. Moreover, as stated above, the District could have assumed the function of

presenting women in Superior Court as it assumed the function of transporting

them (and men) to and from the jail.

 Even if some statute required the District to hand over its arrestees to the

Superior Court Marshal, the District would still be liable, at least since it knew or

should have known that the Superior Court Marshal was subjecting them to illegal

blanket strip searches and it was under Court order not to strip search arrestees.

The <u>Morgan</u> Order obliged it to take action, at minimum by asking the <u>Morgan</u>

Court to address the issue, to prevent the violation of a court order. The District

could have held presentments at the stations or somewhere else or by video

presentment, as is done in other jurisdictions, thereby obviating the need to deliver

pre-presentment arrestees to the Marshal, or assumed the function of presenting

arrestees to judges. To the extent 28 USCA §561(c) conflicted with the District's

Constitutional duty to protect its arrestees, §561(c) would have to yield pursuant to

the Supremacy Clause, or the District is liable because municipal liability exists

where a municipality has a policy, custom, or practice of following a state law to

an unconstitutional end.  <u>Evers v. County of Custer</u>, 745 F.2d 1196, 1203 (9th Cir.

1984); <u>Conroy v. City of Philadelphia</u>, 421 F.Supp.2d 879, 886-87 (E.D. Pa. 2006)

(under Supremacy Clause state mandate no shield from liability for violation of

federal law); <u>Quinones v. City of Evanston</u>, 58 F.3d 275, 277-78 (7th Cir. 1995).

Moreover, regardless of whether the Superior Court Marshal is a §1983

person (though plaintiffs contend that he is) both the District and Dillard would be

liable as joint tortfeasors, which would leave the District liable regardless of any

immunity Dillard might enjoy.  <u>Hedgepeth ex rel. Hedgepeth v. Washington</u>

<u>Metropolitan Area Transit Authority</u>, 386 F.3d 1148, 1153 (D.C. Cir. 2004)

("ordinarily when two tortfeasors jointly contribute to harm to a plaintiff, both are

potentially liable to the injured party for the entire harm").  In <u>Hedgepeth</u> the Court

of Appeals held that an action was justiciable with respect to both the District of

Columbia and WMATA because of the combined effect of the District's statute

(no eating on Metro; and District law which did not authorize citation for minors)

and WMATA's zero-tolerance enforcement of the (no eating on Metro) statute.  Id.

"The arrest provision only becomes mandatory when paired with a zero-tolerance

enforcement policy."  Id. at n.4.

### c.    THE DISTRICT IS LIABLE BECAUSE THE SUPERIOR COURT MARSHAL IS AN ORGANIC PART OF THE DISTRICT GOVERNMENT.

The Superior Court Marshal is *part of the organic government of the District

of Columbia* just as much as the Mayor, City Council and Superior Court. He

handles pre-presentment arrestees either as the policy maker for the District, by

delegation from the policymaker, or pursuant to a widespread custom or practice in

which the District of Columbia acquiesced.  See Jett v. Dallas Independent School

District, 491 U.S. 701 (1989).  His powers flow from the Superior Court.  Any

other construction would contravene Congress' overriding intent in the 1970 Court

Reform and 1973 Home Rule Acts to create an autonomous local government and

judiciary.

### i.     The Government Of The District Of Columbia Is Detached From The Federal Government And Includes The Superior Court And The Superior Court Marshal.

Congress created the Superior Court (three years before the Home Rule Act) pursuant to a delegation of its Art. I, §8, cl.17[12] plenary power, not its Article I national legislation powers, as stated in the statutes implementing the "Court Reorganization Act[13]" (D.C. Code §11-101(2) (2001)), thereby pronouncing an absolute separation of the functions of the local District judiciary (the "local D.C. Courts") from the Article III District and Circuit Courts for the District of Columbia.  Palmore, 411 U.S. at 390; Jenkins, 236 F.3d at 10.  The District government is a "body corporate" independent from the federal government under Art. I, §8, cl.17. District of Columbia Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) ("Home Rule Act").

Because Congress created the District pursuant to Art. I, §8, cl.17, rather than Art. I, §8, cl.18, the District is also disengaged from the federal government. The Home Rule Act made the "local D.C. Courts" part of the government of the District of Columbia.  Home Rule Act, §431(a).  Thus, the Superior Court is an organic part of the government of the District of Columbia and is "disengaged"

---

[12]Art. I, §8, cl.17 gives Congress the power to "exercise exclusive Legislation in all Cases whatsoever" over the District.

[13] The District of Columbia Court Reform and Criminal Procedure Act of 1970, 91 Pub. L. No. 358, 84 Stat. 473 (1970) ("Court Reform Act").

from the federal government with respect to its judicial and administrative

functions.  Court Reorganization Act; H.R. Rep. No. 1508, 93d Cong., 2d Sess. 46-

48.

> **ii.    The District Is Liable For The Conduct Of Superior Court Persons Taken Pursuant To A Policy Or Practice Of The District**

This Circuit recognizes that the Superior Court, its administrative bodies[14],

and its "personnel[15]," are §1983 persons, and integral parts of the government of

the District. The District is liable when they act according to a policy or custom of,

or promulgated or sanctioned by, the District.  Atherton v. District of Columbia

Office of Mayor, 567 F.3d 672, 691 (D.C. Cir. 2009) (affirming District Court's

decision that claim against "juror officer" under  §1983 survives a motion to

---

[14] The administrative bodies of the Superior Court are: the District of Columbia Commission on Judicial Disabilities and Tenure (created by Court Reorganization Act D.C. Code §11-1521 under the Home Rule; removing the Presidential power to select chairman and empowering to choose own chairman from its members); (2) Judicial Nomination Commission (created by Home Rule Act §434); (3) Joint Committee on Judicial Administration (created by Court Reorganization Act with no major changes in Home Rule Act).  Solely pursuant to Congress' plenary power over the District, but pursuant to an Article III grant as in the case of Article III *federal* judges, Congress gave the President limited participation in these bodies.

[15] As discussed below, In Subchapter II (Court Personnel) of Chapter 17 (Administration of District of Columbia Courts) of the Court Reorganization Act, Congress created or "continued" certain "personnel" to administer the Superior Court.

dismiss). In fact, this Court has even held that the Chief Judge of the Superior Court is a §1983 person. Roth v. King, 449 F.3d 1272, 1286 (D.C. Cir. 2006).

Likewise, a lawsuit against the "Superior Court," against one of the three administrative bodies of the Superior Court (such as the Joint Committee on Judicial Administration), or against one of the "Subchapter II personnel" in his/her official capacity, is a suit against the government of the District of Columbia. Kundrat v. District of Columbia, 106 F. Supp. 2d 1, 7, n.11 (D.D.C. 2000).

Although the Superior Court and the Superior Court Marshal were created by different statutes (the former before the Home Rule Act and the latter after it) both are organic parts of the government of the District of Columbia. Just as the District is liable for the unconstitutional conduct of Superior Court personnel when the District is deliberate indifferent, so it is liable for the unconstitutional conduct of the Superior Court Marshal when the District is deliberately indifferent.

### iii.    The Powers of the Superior Court Marshal Flow from the Superior Court.

Congress created the office of the United States Marshal for the Superior Court of the District of Columbia in the Anti-Drug Abuse Act of 1988 (codified at 28 U.S.C.A. §561(c)) (the "Act"). Congress did not assign any powers or duties to the Superior Court Marshal in the Act, nor did it amend any of the existing statutes that authorized (and still do authorize) the District Court Marshal to handle District prisoners and "serve" the District Court judges so that they apply to the Superior

Court Marshal.  Congress did not mandate that the Superior Court or the District deliver its arrestees to the Superior Court Marshal, similar to what Congress did in 1901 when it mandated the warden of the D.C. Jail to receive prisoners from, and to deliver his prisoners to, the District Court Marshal for presentment in court. D.C. Code §24-201.14.

The Act establishes the USMS as "a bureau within the Department of Justice under the authority and direction of the Attorney General." (codified at 28 U.S.C. §561 et seq.), and specifies in detail the powers and duties of the USMS and the United States Marshals vis à vis the judicial districts of the federal courts. The Act clarified that the USMS was under the control of the Justice Department ("DOJ"), where formerly both the Federal Judiciary and the DOJ had exercised control over the Marshals.  Pennsylvania Bureau of Correction v. U.S. Marshals Service, 474 U.S. 34, 47 (1985) (Stevens, J., dissenting) (United States marshals owe obligations to both executive and judiciary branches).

Revised §§561-569 do not grant any federal district marshals any powers with respect to the **Superior Court, or pre-presentment arrestees at the Superior Court**.  To the contrary, the Act addresses the USMS' role regarding the federal courts (as opposed to addressing at all the local D.C. Courts). 28 U.S.C.A. §566(a).  Under §§561-569 the powers and duties of the United States Marshals Service are limited to "Federal jurists [and] court officers" enumerated as "United

48

States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court" in §§566(a) and (e).

Prior to the creation of the local D.C. Courts in 1970, the Marshal for the District of Columbia had performed functions for the District pursuant to enabling statutes. See, e.g., D.C. Code §16-703 (MDC serves process for local D.C. Courts); D.C. Code §23-562 (execution and return of warrants); D.C. Code §24-201.13 and 14 (statutes authorizing and obligating the District Court Marshal to transport District prisoners between the Superior Court courthouse and the D.C. Jail) (both enacted 1901).

When Congress established the local D.C. Courts (Superior Court and Court of Appeals) in the Court Reorganization Act of 1970, it did not establish a separate office of the Superior Court Marshal for the Superior Court.   Congress had to enact D.C. Code §11-1729[16] to order the United States Marshal for the District of Columbia to "serve the Superior Court."  Without D.C. Code §11-1729, the District Court Marshal would not have been obligated to perform services for the Superior Court, except for those already required by the pre-existing enabling statutes enacted by Congress, because the local D.C. Courts are distinct from the federal judiciary. See Pennsylvania, 474 U.S. 34, 47 (1985) (Stevens, J.,

---

[16] "The United States Marshal for the District of Columbia shall continue to serve the courts of the District of Columbia, subject to the supervision of the Attorney General of the United States".

49

dissenting), whereas the USMS' powers and duties related to the federal courts. Congress also left in place such statutes as D.C. Code §24-201.14 mandating the warden of the D.C. Jail to receive prisoners from and to deliver his prisoners to the District Court Marshal for presentment in court.

Congress did not repeal D.C. Code §11-1729 (and the other pre-existing statutes relating to service of the Superior Court by the "United States Marshal for the District of Columbia" or the "Marshal") when it created the Superior Court Marshal. Nor did Congress amend any pre-existing statutes which governed the Marshal for the District of Columbia and his powers and duties with respect to the Superior Court and District of Columbia prisoners when it created the Superior Court Marshal to make them applicable to the Superior Court Marshal.

As the District Court recognized, in actual practice the Superior Court Marshal "inherited the former duties of the Marshal for the District of Columbia vis à vis the Superior Court," 584 F.Supp.2d at 92. One of the duties the Superior Court Marshal "inherited" then was "to serve the courts of the District of Columbia." The only reasonable interpretation is that the Superior Court Marshal inherited both the powers and the **duties** of the District Court Marshal, thereby obligating him to "serve" the Superior Court judges and not vice versa. In the absence of any statutes granting him powers and duties, the Superior Court Marshal acts based on the inherent powers of the Superior Court. Handling pre-

presentment arrestees and post-presentment detainees at the Superior Court

courthouse is part of his duty to "serve" the Superior Court judges.[17]

> ### iv.   The District Court's Ruling On The District's Liability Under The Organic Theory Is Wrong.

The District Court erroneously concluded that the District cannot be held

liable under the organic or entrustment theories because it has no authority to

control the Superior Court Marshal and no choice but to turn over its arrestees to

the Superior Court Marshal. 584 F.Supp.2d at 92-93 (D.D.C. 2008).  The District

does not need control over the Superior Court Marshal in order to be liable under

§1983 when the Superior Court Marshal exercises the District's §1983 powers.

The District does not control the Superior Court and yet the District is liable for the

Superior Court, its administrative bodies and its "personnel" when they act

pursuant to a custom or policy because the Superior Court is part of the District.

See e.g. Atherton, supra.  Likewise, the US Parole Commission does not control

the District nor vice versa, but the Commissioners exercise District powers when

they handle D.C. parolees. See, e.g., Fletcher v. Dist. of Columbia, 370 F.3d 1223,

1227 *judgment vacated on reh'g on other grnds,* 391 F.3d 250 (D.C. Cir. 2004)

---

[17] The Superior Court controls how the Superior Court Marshal treats District prisoners in other respects.  For example, the Chief Judge of the Superior Court has ordered the Superior Court Marshal to release misdemeanor jail cases released at court hearings from the courthouse rather than returning them to the D.C. Jail as before.  Superior Court of the District of Columbia Administrative Order, 08-23

(US Parole commission members are §1983 persons when they act pursuant to D.C. Revitalization Act). Because the Superior Court Marshal "serves" the Superior Court, and the Superior Court is part of the District, the Superior Court Marshal is a §1983 person, and, when he acts as a policymaker as he did here, the District is liable.

## VII.     PLAINTIFFS RAISED A MATERIAL ISSUE OF FACT ON MARSHAL DILLARD'S DISCRIMINATORY INTENT

Dillard did not assert qualified immunity in his summary judgment motion on plaintiffs' equal protection claim.  The trial court did not grant summary judgment on that basis, but rather because there was not sufficient evidence of discriminatory intent.

### a.  *Dillard's Defense That He Neither Knew About Nor Intended Women-Only Strip Searches.*

Plaintiffs must prove Dillard intended to discriminate against women arrestees and plaintiffs can do this by showing he intended a policy, formal or informal, of women-only strip searches.  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (must prove action done for the purpose of discriminating on the basis of race or other prohibited classifications); Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270, 113 S. Ct. 753 (1993) ("the 'animus' requirement …[demands] at least a purpose that focuses upon women by reason of their sex"; it

searches, all evidence that Dillard had a discriminatory strip search policy and practice. Establishing Dillard's knowledge is one link in an evidentiary chain establishing his discriminatory intent, Farmer, 511 U.S. at 842-843, especially given his denial of knowledge and the suggestions of pretext and cover-up (discussed in detail below). See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 134, 120 S. Ct. 2097, 2101-02 (2000) ("factfinder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination… In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose") (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993)); St. Mary's Honor Ctr., 509 U.S. at 536 ("common experience tells us that is more likely than not that the employer who lies is simply trying to **cover up** the illegality alleged by the plaintiff")(internal citations omitted).

Plaintiffs' equal protection claim is distinguishable from Iqbal's. First, Iqbal addressed whether defendants Ashcroft and the director of the USMS were "liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Petition for Writ of Certiorari at 3, Question 2, Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). In contrast, Marshal

54

suffices if defendants are "motivated by a purpose (malevolent or benign) directed specifically at women as a class").

Dillard contends that he neither knew about nor intended women-only strip searches. Intent in a constitutional claim is a question of fact subject to proof in the usual ways, including by inference from circumstantial evidence, and a factfinder may conclude that an official ***knew*** of a fact from the very fact that the fact was obvious. <u>Farmer</u>, 511 U.S. at 842-843. Dillard's summary judgment motion shifted the burden to plaintiffs to designate "specific facts showing that there is a genuine issue for trial," <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986), which plaintiffs did by identifying specific facts in the record indicating that his claim that he did not intend women-only strip searches was implausible. <u>Barham v. Salazar</u>, 556 F.3d 844, 845 (D.C. Cir. 2009); <u>Barham v. Ramsey</u>, 434 F.3d 565, 578 (D.C. Cir. 2006).

Plaintiffs concede "mere knowledge" of the strip searches would not satisfy an equal protection claim, <u>Iqbal</u>, 556 U.S. at 677. Here there is far more, including deposition testimony, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████, the <u>Helton</u>/<u>Clifton</u> interrogatory responses (representing the position of the USMS), the Cellblock supervisor's testimony, and a practice of women-only strip

Dillard worked in the cellblock and testified that he randomly, yet frequently, observed searches of male lock-ups, asked his supervisors to do the same, and presided over meetings that included discussions of Cellblock searches. [Dkt. 234, 235] Ps.Ex.524 Dillard (Johnson) Depo, pp.50-55. (SEALED)

Secondly, although Iqbal said that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," 556 U.S. at 677, it did not alter the rule that intent can be proved by circumstantial evidence. Farmer, 511 U.S. at 842-843. Plaintiffs do not contend that Dillard's "mere knowledge" establishes liability, but that the evidence, and inferences to be drawn from missing evidence within Dillard's control, provide facts from which a reasonable jury could infer that Dillard had a discriminatory policy of subjecting female prisoners but not male prisoners to blanket strip searches, and that he did so with "a purpose that focuses upon women by reason of their sex." Bray, supra, which is admitted given the rationale that the distinction between men and women was based on the fact that women had vaginas.

### i. The Practice Of Strip Searching Only Women Is Circumstantial Evidence Of Intent

The Helton/Clifton interrogatory responses establish that at least until June 2002 the practice in the cellblock was to strip search all women prisoners but no men because females have an extra orifice in which to conceal contraband. [Dkts. 251-1, 251-2]; [Dkt. 233-57] Shealey Depo, pp.126:1-11, 15-16; 125-126. See

also [Dkt. 243-1] Plaintiffs' Opposition to Defendants' SMF, pp.81-99

(summarizing and citing evidence of practice of women-only strip searches).

Whether there are contrary facts asserted, these are facts from which a jury could

infer Dillard's intent (not just his knowledge) is the practice of strip searching

women but not men, given that the practice continued after these responses in the

Helton/Clifton cases (2002), that Dillard was the Marshal when they were made,

and that they only stopped after this lawsuit was filed in April 2003, [Dkt. 24, ¶2].

Barham v. Salazar, 556 F.3d at 845.  Virtually no one stated that the policy or

practice was to strip search male prisoners entering cellblock, Lorton men or men

jail cases. [Dkt. 243-1] pp.87-99. Dillard even testified in his deposition that his

policy was to continue strip searches of all prisoners until he left in 2004, but in

April 2003 he filed through counsel (along with the Marshals service) a document

stating that the discriminatory strip searches had stopped no later than 4/28/2003

and that no one in the cellblock would be strip searched absent an individualized

reasonable suspicion that they were secreting contraband.  [Dkt. 24]. Either he does

not remember what his policy was, or he is lying.  Either way, a jury could find

that his testimony about his intent is unreliable.

### ii. Evidence Of Policy Statements

The Helton/Clifton interrogatory responses [Dkts. 251-1, 251-2] discussed

above stated that the women-only strip search policy was **consistent** with Policy

Directive 99-25.[18]  Dillard did not recall ever having seen Policy Directive 99-25

[Dkt. 232-2] when shown it at his deposition. [234, 235] Ps.Ex.524, Dillard

(Johnson) Depo, p.183:14-20. (SEALED) His asserted ignorance of such a policy

directive is further evidence of his intent, both because a jury could disbelieve it,

and because it could infer bad faith from such obvious falsehoods.

Dillard says he had his own written policy statement for the Superior Court.

Id. at p.23.  Shealey referenced the standard operating procedures "as a go-by in

relation to the duties and responsibilities within the D.C. Superior Court Marshals

Office" which were compiled using input from the section supervisors, [Dkt. 233-57]

Shealey depo at 320.

When Shealey took over as cellblock supervisor from Mitchell in January

1999, there were written procedures in place, signed off on and issued by Dillard,

and issued authorizing the drop, squat, and cough procedure for every single

woman coming in to the women's lock-up, [Dkt. 233-57] Shealey Depo pp.126:1-

---

[18] Policy Directive 99-25, [Dkt. 232-2], distributed by the USMS sometime in 1999, is a general policy covering "body searches" of prisoners in USMS custody. It does not refer specifically to the Superior Court or to cellblock searches.  Policy Directive 99-25 on p.7 of 7 does reference a document called "Policy Directive, Cellblock Operations; OGC Legal Update, No. 7, June 1999,"  but neither the USMS nor Dillard produced that document to plaintiffs in response to their document production request for written strip search polices.  Policy Directive 99-25 states that USMS policy is to strip search prisoners only on reasonable suspicion.  [Dkt. 232-2] pp.3-4.  It does not authorize drop, squat, and cough searches.  Nor does it authorize blanket strip searches of all prisoners entering a Cellblock.

11, 15-16; 125-126. Mitchell says Rowe (with input from Mitchell and the other

supervisory deputies) drafted new standard operating procedures at Dillard's

direction when draft versions of Policy Directive 99-25 came out, and Dillard

revised them and issued them under his signature. [Dkt 233-51] Mitchell Depo, p.

20:13-16.  Hedgepeth also references standard operating procedures that came out

in late 1998. [Dkt. 233-20] Hedgepeth Depo. (7/18/07), p.16:1-3. Dillard says he

left his written policies in his office at the Superior Court when he left in 2004.

This establishes that the policies were in existence two years after this lawsuit was

filed. [Dkts. 234, 235] Ps.Ex.524 Dillard (Johnson) Depo, 185:318. (SEALED)

Although his and his attorneys' duty to preserve them began in 2002, they were not

produced, or even listed, in response to plaintiffs' document production requests..

[Dkt. 246] Ps.Ex.801, response to request #1. (SEALED)

Because defendant never acknowledged or produced Dillard's written

search policy, plaintiffs are entitled to an adverse inference that the policy was to

strip search all female prisoners but not males, Mazloum v. District of Columbia

Metropolitan Police Dept., 530 F.Supp.2d 282, 289 (D.D.C. 2008), especially since

Dillard produced older documents in support of his motion for summary judgment

(defendant's exhibit 4, purported letter to MPD, dated 1998) from **1998,** and

incident reports (defendant's exhibit 2) (incident reports going back to the 90s),

that he contends supports his claim that poor MPD search practices caused

contraband to flow into the cellblock. [Dkt. 232], Dillard's SMF ¶25, defendant's combined motion for summary judgment SMF, p.51 of 78. Alternatively, since Dillard violated Rule 37 by failing to disclose the documents in his document production responses, and failed to produce them, and failed to supplement at any time, defendant should not be able to assert that he had a policy different from the Superior Court search policy and practice disclosed by the Marshal's service in the Helton/Clifton interrogatory responses [Dkts. 255-1, 255-2]. Fed. R. Civ. P. 37(c)(1)(C) and 37(b)(2)(A)(i)-(vi).

### iii. Conflicts In Testimony Evidence A Cover-Up

The conflicts in Dillard, Rowe, and Mitchell's testimony with each other, the Helton/Clifton interrogatory responses affirmatively establishing the female only strip search policy, the stand-still agreement announcing the new strip search policy [Dkt. 24], supervisors and staff testimony affirming the same, along with contradictory testimony evidencing pretext and a cover-up, taken together would allow a jury to conclude that Dillard's policy directed the practice, and that Dillard, Rowe and Mitchell tried to cover up Dillard's policy when sued in this lawsuit.

Dillard testified in his deposition that his policy was (1) to strip search all prisoners entering the Cellblock (2) until he left the office of Superior Court Marshal in 2004. [Dkt. 234, 235] Ps.Ex.524, Dillard (Johnson) depo, pages 99:8-14, 99:17-18, 104. (SEALED) The Stay Dillard filed through counsel on

4/25/2003, admissible against him under FRE 801(d)(1)(A), contradicts this,

stating that "the federal defendants [**which includes Dillard**] will implement by

**4/28/2003** a strip search policy that permits strip searches only upon, at least,

individualized reasonable suspicion, upon approval by a supervisor, and will be

applied to men and women in the same way." [Dkt. 24, ¶2]. Virtually all

deponents testified that neither male jail cases nor Lorton prisoners (males only)

were ever strip searched. [Dkt. 243-1, pp.97-99]. Mitchell says Rowe told him in

1998 when he first started, before the change in the strip search policy, to strip

search arrestees, not jail cases. [Dkt. 233-51] Mitchell Depo, p.106. Deputies

stopped blanket strip searches of male arrestees in 1999. [Dkt. 243-1, pp.87-96].

Mitchell testified that Dillard told him in 1999, when Rowe was drafting the new

policy, to strip search all arrestees (but not jail cases) until a "more customized"

policy was in place, [Dkt. 233-51] Mitchell Depo, pp.22-23. The evidence shows[19]

the "more customized" policy was to stop strip searching males and to continue

strip searching females as the USMS described in the Helton/Clifton interrogatory

---

[19] E.g. Mitchell says Dillard stopped strip searches of both men and women and
quotes "specifically" Hargrove expressing her relief to him she no longer had to
strip search women as proof Dillard stopped blanket strip searches of women in
2000 or 2001, [Dkt. 233-51] Mitchell Depo, p.50:1-8. Hargrove's deposition
testimony in Clifton contradicts him because she says in that deposition in
September 2002 that the Agency "policy" of blanket strip searches had been in
place for the preceding seven years. [Dkt. 233-70] Hargrove depo (Clifton) pp.7-9.
The Helton interrogatory responses #8 state that as of at least February 21, 2000,
the date of the incident, the policy was to strip search women only. [Dkt. 251-1]

responses, #8.  [Dkts. 251-1, 251-2] Dillard says he frequently and randomly went

into the male search room to observes searches, [Dkts. 234, 235] Ps.Ex.524,

Dillard (Johnson) Depo, pp.50:6-18; 51:9-15; 54:9-15, 227-228, 229; (SEALED)

and he instructed Rowe and his supervisors to do the same. He saw Rowe, and

other supervisors, look inside the male search room to observe the strip searches of

males. Id., at 54:9-55:13.  This contradicts the Helton/Clifton interrogatory

responses, and the testimony of virtually every other deponent who virtually all

testified that male arrestees were not strip searched after Policy Directive 99-25

[Dkt. 232-2] came out.  [Dkt. 243-1, pp.87-96].  The District Curt resolved this

conflict in defendant's favor by disregarding testimony offered by Dillard himself

["Def.'s Mem., [Attach. 6]"] and accepting testimony from some deputies that

Dillard seldom went into the male search room during strip searches without even

analyzing whether the deputies were often in the Cellblock.  780 F.Supp.2d at 79-

80.  However, on Dillard's summary judgment motion, plaintiffs' evidence, not

defendant's, must be credited, and all reasonable inferences must be drawn in favor

of plaintiffs as the non-moving parties.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 255 (1986).

 Rowe also says the policy was to strip search all prisoners [Dkt. 234, 235]

Ps.Ex.548 Rowe (Bame) Depo, pp.19-21 (SEALED) and that he did not know

about the women-only policy.  Brandt says Rowe directed the women-only strip

61

search practice implemented in 1999/2000, so he knew. [Dkt. 233-33] Brandt Depo, p.65:3-5.

Rowe says he believed the strip search policy in the cellblock after 1995 was to strip search all prisoners, 258:8-259:12, he believed the actual strip search practice from about 1995 was to strip search all prisoners, 262:22-263:20, and that he spent the majority of his time with the transport vehicles, 309:6-315:4, he never looked into the male search room to see what kinds of searches the deputies were doing, 154:15-20, or took any other steps to see what types of searches were used in the Cellblock, 180:5-181:20, Dillard never asked him to, 157:10-17, he never heard anyone say how searches were to be conducted in the Cellblock, 178:19-180:2, he does not remember Dillard ever putting out a written policy on searches, 178:19-180:2, and that he "Never gave [what type of search policy was in place at the Superior Court] any thought," 135:19:22, and the policy of strip searching all prisoners never changed while he was at Superior Court, 298:7-18. (All references are to [Dkt. 234, 235] Ps.Ex.548 Rowe (Bame) Depo, SEALED)

Dillard and Mitchell contradict all of this. Mitchell testified that Rowe came **down to the cellblock** when he first started in 1998 and told him (before the change to women-only strip searches in 1999/2000) to strip search male and female lock-ups but not male jail cases, so Rowe said the policy was to strip search arrestees but not jail cases. [Dkt. 233-51] Mitchell Depo, pp.86-89. Dillard says

throughout his tenure he saw Rowe go into the Cellblock (on his orders) to observe strip searches. [Dkt. 234, 235] Ps.Ex.524, pp.53-55.  The <u>Helton</u> interrogatory responses #8 state that as of at least February 21, 2000, the date of the incident, the policy was to strip search women only, so Rove must have known.  [Dkt. 251-1]

Both Mitchell and Barry Surles[20] saw Rowe in the Cellblock just before and during the class period.  Moreover, Mitchell describes several meetings with Rowe and Dillard about the change in policy which he says was from strip searching all lock-ups to strip searching lock-ups only upon individualized reasonable suspicion. In fact, Mitchell says Rowe drafted the policies, which contradicts Rowe's testimony that the policy was to strip search all prisoners, and that Dillard never put out written policies.  Surles says Rowe came into the Cellblock a couple times per week to see, and to ask what was going on in the Cellblock. [Dkt. 233-14] Surles Depo, pp.41:18 to 42:19.  Brandt said the female search practice (subjecting all female prisoners to strip searches) was directed by Rowe. [Dkt. 233-33] Brandt Depo, p.65:3-8.

Shealey Depo ([Dkt.233-57] at 160, 163–68) and Mitchell ([Dkt. 233-51] Mitchell Depo, pp.19-20) both testified that no one ever instructed them how to strip search lock-ups.  Elsewhere in his deposition, Mitchell contradicted both

---

[20] Surles worked as Cellblock supervisor for about 6 months in 1999 (p.m.) and for 3-5 months in 2002 (a.m.) when Shealey left). [Dkt. 233-14] Surles Depo, pp.15:7-15; 17:18-19.

himself and Shealey. Mitchell testified that supervisor Stirling Murray told him to strip search all lock-ups before Shealey took over as Cellblock supervisor.  [Dkt. 233-51] Mitchell Depo, pp.19-20; 205-206.

Mitchell also testified that he "corrected" Shealey when Shealey first became Cellblock supervisor and told him not to strip search every male lock-up and that Shealey had received a copy of the policy. [Dkt. 233-51] Mitchell Depo, pp.136-146, Shealey referenced policies in place when he arrived (signed off on by Dillard) that authorized the blanket strip searches of the females. [Dkt. 233-57] Shealey Depo, pp.125-126.

The FTCA emails (and related case assignment form) informing Rowe  of the Helton and Clifton FTCA women-only strip search claims[21] and the responses from Rowe and supervisor Murray, respectively, evidence that Dillard and Rowe knew about the women-only strip searches as early as 10/10/2000, the date of the first email, [Dkts. 245, 246] Ps.Ex.701-712; 802-803 because Dillard testified that every time Rowe got an FTCA email Rowe would pass it to him, and keep him in the loop on  FTCA claims. [Dkts. 234, 235] Ps.Ex.524, Dillard (Johnson) Depo,

---

[21] Both the Helton and Clifton plaintiffs submitted FTCA notices detailing their claims to the USMS. Helton FTCA notice dated 8/14/2000, [Dkts. 245, 246] Ps. Ex.701 Clifton FTCA notice dated 8/2/2001 (SEALED); [Dkts. 245, 246]. Ps.Ex.708 (SEALED) ███████████████████████████████████
████████.

146, 155-56. John Patterson, the FTCA claims administrator in charge of
processing FTCA claims for the USMS, emailed Carl Rowe on 10/10/2000
advising him of a claim, regarding female but not male strip searches after an arrest
at the Mazza Gallerie Mall (unknown arresting agency). [Dkts. 245, 246]
Ps.Ex.702. Patterson attached a copy of his acknowledgment letter to the FTCA
claim to his email to Rowe, the text of which states that the claimants allege that,
following the "arrest [of six males and 5 females] and subsequent transport to the
D.C. Superior Court courthouse cellblock, USMS employees unlawfully strip
searched all your female clients and required each of your clients to urinate in view
of others awaiting arraignment." Id. Rowe replied three hours later saying
Patterson had the "wrong parties," [Dkts. 245, 246] Ps.Ex.703, but Patterson
nonetheless opened a "case file" on 10/24/2002 listing the Superior Court as the
location of the strip searches. It must have been communicated to Rowe that the
claim dealt with strip searches at Superior Court. [Dkts. 245, 246] Ps.Ex.706. Ten
months later, on 8/8/2001 Patterson again emailed Rowe informing him that
another female strip search claim had been filed, [Dkts. 245, 246] Ps.Ex.711 and
asking for "all available information/reports of our USMS involvement (if any)
giving rise to the claim," which suggests further discussion and information. Id.
Stirling Murray responded to Patterson's email. [Dkts. 245, 246] Ps.Ex.712.
Mitchell testified all FTCA emails went to Rowe, that Rowe would brief Dillard on

them, [Dkt. 233-51] Mitchell Depo, p.210, and that Murray would have answered an FTCA email only if Rowe told him to. Id. at 211.

Rowe testified in his <u>Bame</u> deposition that, although he did not recall whether he knew about the <u>Helton</u>/<u>Clifton</u> claims in 2000, he occasionally consulted with the general counsel's office. **"If the marshals were involved in it** [the <u>Helton</u>/<u>Clifton</u> claims] **and they had questions regarding it, they would have made me aware of it."** [Dkts. 234, 235] Ps.Ex.548, Rowe (Bame) Depo p. 71-73. (SEALED)

## VIII.    THE TRIAL COURT ERRED IN FINDING QUALIFIED IMMUNITY FOR THE MARSHAL ON THE FOURTH AMENDMENT VIOLATIONS.

Plaintiffs contend that that <u>Bame</u>, 637 F.3d at 380 should not control this case or, if it does, should be reconsidered <u>en</u> <u>banc</u> because <u>Bame</u> (1) did not meaningfully address the effect of the <u>Morgan</u> Order, describing it only as an agreement prohibiting the strip searches at issue here; (2) did not focus the inquiry on those likely to be released; and (3) unlike in <u>Bame</u>, the record in this case contains substantial evidence showing Dillard's policies and practices were an unnecessary or unjustified response to problems of jail security.

Dillard is liable on a direct liability theory because he implemented the women only strip searches, or on a supervisory liability theory because he knew or should have known about the practice of blanket strip searches of women arrestees

arrested on minor charges, or "turn[ed] a blind eye for fear of what [he] might see." Barham v. Ramsey, 434 F.3d at 578. Plaintiffs need only prove an objective knowledge on Dillard's part because the underlying state of mind on a Fourth Amendment claim is an objective one. Iqbal, 556 U.S. at 676 (factors necessary to establish a constitutional violation vary with the constitutional provision at issue).

### a. EVEN IF THE LAW WAS NOT CLEARLY ESTABLISHED BY DECISIONS OF THIS COURT, IT WAS BY VIRTUE OF COURT ORDERS THAT BOUND THE DISTRICT AND ITS AGENTS.

The District Court, in granting Dillard qualified immunity on the Fourth Amendment claim, relied exclusively on the panel decision in Bame, 637 F.3d 380. In Bame, plaintiffs brought a Bivens action against Dillard, alleging that they had been subjected to unconstitutional strip searches upon being processed into holding cells at the Superior Court courthouse. Specifically, the Bame plaintiffs challenged the policy and practice of strip searching all male arrestees upon arrival at the Superior Court awaiting disposition of the charges against them. Bame, supra, at 383.

The Bame Court concluded that, in light of Bell v. Wolfish, the law in 2002 did not clearly establish that strip searching arrestees prior to placement in holding cells at the Superior Court violated the Fourth Amendment even though all Circuits to address the issue (which did not include this Circuit) at that time had determined that such searches required individualized reasonable suspicion. The Court pointed

to subsequent decisions so interpreting <u>Bell</u>, <u>e.g.</u> <u>Powell v. Barrett</u>, and concluded that, even in the context of a consensus of courts of appeals, it was reasonable for an officer to conclude otherwise "when a precedent of the Supreme Court supports the lawfulness of his conduct." 637 F.3d at 386.

The majority noted but discounted the District Court opinion in <u>Helton v. United States</u>, 191 F.Supp.2d 179, 184 (D.D.C.2002), an unpublished Ninth Circuit decision, <u>ACT UP!/Portland v. Bagley</u>, 1995 WL 375822, at *5 (June 22, 1995) (denying qualified immunity to the deputy Marshals who had **strip searched** demonstrators in the district court cellblock who had been arrested and were awaiting presentment on disorderly conduct charges), and the Memorandum of Agreement in <u>Morgan v. Barry</u>, Civ. A. No. 81–1419, in which the District had signed a Memorandum of Agreement not to strip search female arrestees prior to arraignment without individualized, reasonable suspicion or unless the arrestee would come into contact with the general inmate population and which the district court entered as an order.

<u>Bame</u> does not address the significance of the fact that <u>Morgan</u> was not just an agreement, but a court order.

District Judge Audrey Robinson entered an injunction on July 22, 1981 (the "<u>Morgan</u> Order") which specifically prohibited, among other things, the District from conducting blanket strip or squat searches of female "police cases" (arrestees,

p.1, n.1). [Dkt 68-1] (Morgan Order); Morgan v. Barry, 596 F. Supp. 897, 898 (D.D.C. 1984). The Morgan Order applies by its terms to all female arrestees in the custody of the District of Columbia, regardless of where they are held. Id. p.1. The Morgan Order remains in effect to this day. Morgan v. Barry, 81-cv-1419, Docket No. 82, 1985 (docket sheet)(October 29, 1985 order continuing Morgan Order "for an indefinite period of time"). As this was a court **order** that applied to the District and its agents, Marshal Dillard was bound by it regardless of whether he could have reasonably believed it was wrong. A court order is, if anything, even more binding than controlling precedent since one can be held in contempt of court for violating it, and controlling precedent is binding even if one could reasonably disagree with it. Youngbey v. March, 676 F.3d 1114, 1124 (D.C. Cir. 2012) ("in determining whether …rights … are clearly established, a court must look to 'cases of controlling authority in [its] jurisdiction.'") (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999). Similarly, ACT UP!/Portland v. Bagley, 1995 WL 375822, at *5 (June 22, 1995) (denying qualified immunity to the Deputy Marshals who had **strip searched** demonstrators who had been arrested) was an unpublished opinion, but it bound the USMS, a defendant, Dillard's agency.

### b. EVEN IF THE LAW WAS NOT CLEARLY ESTABLISHED BY DECISIONS OF THIS COURT, IT WAS CLEARLY ESTABLISHED BY VIRTUE OF COURT ORDERS THAT BOUND THE DISTRICT AND ITS AGENTS.

The qualified immunity question in this case is whether arrestees arrested on minor charges, held outside the general population, likely to be released at or before presentment, had in 2002 a clearly established right to be free from strip searches. See, e.g., Davis v. Scherer, 468 U.S. 183, 194, 104 S. Ct. 3012, 3019 (1984) (official not liable for "damages under §1983 unless the constitutional right he was alleged to have violated was 'clearly established' at the time of the violation").

The question, as the panel put it, was whether it was clearly established at the time of the searches in 2002 that strip searching all arrestees before placement in a detention facility without individualized, reasonable suspicion was unconstitutional. Id. at 384. The panel did not address the more narrowly focused inquiry posed above: the right of arrestees, not entering general population, to be free from strip searches prior to presentment to the court. The distinction between the Bame panel's formulation of the qualified immunity question and the issues in this case is critical because the inquiry we pose focuses on those likely to be released.

70

### c. *PLAINTIFFS' FOURTH AMENDMENT CLAIM IS DISTINGUISHABLE FROM BAME'S QUALIFIED IMMUNITY ANALYSIS*

Plaintiffs' Fourth Amendment claim is distinguishable from Bame for the reasons stated above. Moreover, plaintiffs' case is also distinguishable from Bame on qualified immunity grounds. First, Dillard strip searched all women pre-presentment arrestees arrested on minor charges held outside the general population, but no men even though men outnumbered women four to one. Bame did not base its analysis on a claim that Dillard strip searched men but not women. This factor is relevant outside plaintiffs' equal protection claim because it undermines every justification Dillard asserts for his search: if a penological reasons existed to justify strip searches for women why were men not also strip searched? A strip search policy or practice that subjects women to blanket strip searches because they have a vagina is based on an out-moded chauvinistic view of women and is, by definition, unreasonable. Dillard had "fair warning" such searches were unreasonable because it was "obvious." Hope v. Pelzer, 536 U.S. 730, 741-742 (2002). No court has ever upheld such searches. Most people would be embarrassed to make such a claim, and sweep it under the rug as the District Court did below. In the Helton and Clifton cases, before a class action claim raised the stakes, the USMS justified such a policy in interrogatory responses and defended such a claim in a motion to dismiss.

Second, plaintiffs do not base their Fourth Amendment claim on a right to a finding of individualized reasonable suspicion before being searched.

The Bame panel held that it was not "clearly established in September 2002 that strip searching an arrestee before placing him in a detention facility without individualized, reasonable suspicion was unconstitutional." Bame, 637 F.3d at 384. The Bame panel held that none of the cases decided before the strip searches in Bame holding that blanket strip searches of pre-presentment arrestees arrested on minor charges violated the Fourth Amendment gave the Superior Court Marshal "fair warning" that his actions were unconstitutional, because all of their interpretations of Bell were wrong, because Bell did not impose an individualized reasonable suspicion standard. Id. As plaintiffs explained in their earlier submission on the Florence decision, [Dkt. 1372079], Bame was wrongly decided because it ignored the weight the Bell balancing test gives to release status and placement in or out of the general population, and misapplied Bell to strip searches of pre-presentment arrestees arrested on minor charges and held outside the general population.

Plaintiffs do not make the individualized reasonable suspicion argument, and so the rationale of the Bame panel's decision does not control their claim.

Plaintiffs argued that they should be free from blanket strip searches under Logan, the first post-Bell case to apply the Bell balancing test to blanket strip searches of arrestees held outside the general population, because they were pre-

presentment arrestees, arrested on minor charges, held outside the general population, and practically sure to be released at presentment.  See Plaintiffs' opposition to Dillard's motion for summary judgment [Dkt. 243, p.1 et seq.]  Logan did not rely on the individualized reasonable suspicion standard and nor did plaintiffs.  660 F.2d at 1013 (applying Bell balancing test without imposing individualized reasonable suspicion standard).  Logan determined the rule for non-general population cases without reference to individualized reasonable suspicion based on factors such as release status (likelihood of release) and charge (does not indicate weapons or violence).  Id. see also Bell, 441 U.S. at 547 n.28 (evaluating release status of person subjected to a strip search, which incorporates how the severity of charge is a predictor of release and dangerousness).

Like Logan, plaintiffs accepted the need for categorical rules as the Supreme Court has recognized in United States v. Robinson, 414 U.S. 218, 234–235 (1973) and Atwater v. Lago Vista, 532 U.S. 318, 324  (2001).

The rule plaintiffs ask for can be easily administered, as San Francisco County and the FBOP administer it.  Florence, 132 S.Ct. at 1524 and n. * (Alito, J. concurring).  All plaintiffs ask is what Dillard's deputies already did: separated women arrestees into US and Traffic cases when they arrived in the basement of Superior Court based on their charges and the lock-up lists they carried, wrote a lock-

73

up number on wristbands for US cases and a "T" for Traffic cases, and placed them

alone in interview rooms behind the presentment courtrooms.

The San Francisco Sheriff's office and the FBOP administer such systems.

### d. PEARSON POST-EVEN RULE DOES NOT APPLY

The Supreme Court in <u>Pearson v. Callahan</u>, 555 U.S. 223, 244-245 (2009)

has suggested that sometimes clearly established law can become unclear because

of post-event cases. For the reasons stated above, this rule does not apply to this

case. No court has ever upheld blanket strip searches of women (but not men) pre-

presentment arrestees arrested on minor charges and held outside the general

population. Plaintiffs do not base their Fourth Amendment claim on a right to the

individualized reasonable suspicion standard; therefore the <u>Bame</u> panel decision

did not create a post-event split.

However, that rule should not apply in this case as the impact of <u>Bame</u> is

lessened because <u>Bame</u> and this case involve the same defendant. This Court

sitting in a panel or <u>en banc</u> can correct the error. Moreover, the record is much

more fully developed in this case. Dillard had the same opportunity to develop the

record in <u>Bame</u> that he did here.

## IX.   CONCLUSION

For the reasons stated, this Court should reverse the District Court's order granting summary judgment to the District of Columbia and Marshal Dillard, and reverse the order denying plaintiffs' motion for summary judgment.


DATED: October 19, 2012                     Respectfully Submitted,

                                            LITT, ESTUAR, & KITSON LLP
                                            LAW OFFICES OF WILLIAM C.
                                            CLAIBORNE

                                            By____/s/ Barrett S. Litt_____
                                                 Barrett S. Litt
                                                 Attorneys for Plaintiffs/Appellants

## CERTIFICATE OF COMPLIANCE

The text of this brief consists of 17,271 words as counted by the

Microsoft Word XP word processing program used to generate the brief.


DATED:  October 19, 2012                    /s/ Barrett S. Litt
                                            Barrett S. Litt

U.S. COURT OF APPEALS DOCKET NO. 11-5115

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DIANNA JOHNSON, et al
Plaintiffs and Appellants,
vs.
GOVERNMENT OF THE DISTRICT OF COLUMBIA, et al

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
## CASE NO. 1:02-cv-02364-RMC
## [THE HONORABLE ROSEMARY M. COLLYER]

## PLAINTIFFS'/APPELLANTS' ADDENDUM OF STATUTES AND REGULATIONS
### (No Oral Argument Has Been Scheduled)

Barrett S. Litt
Paul J. Estuar
LITT, ESTUAR & KITSON, LLP
1055 Wilshire Boulevard
Suite 1880
Los Angeles, California 90017
Telephone: (213) 386-3114
Email: blitt@littlaw.com

WILLIAM CHARLES COLE
CLAIBORNE III
Claiborne Law
717 D. Street, NW
Suite 210
Washington, DC 2004-0000
Telephone: (202) 725-6063
Email: claibornelaw@gmail.com

Attorneys for Plaintiffs/Appellants

# ADDENDUM OF STATUTES AND REGULATIONS

### TABLE OF CONTENTS

### FEDERAL STATUTES

28 U.S.C. §561 <u>et</u> <u>seq</u>.................................................................................2

28 U.S.C. §1291 ....................................................................................5

28 U.S.C. §1331 ....................................................................................5

28 U.S.C. §1343(a)(3)............................................................................6

28 U.S.C.A. §561(c)...............................................................................3

28 U.S.C.A. §566(a)...............................................................................6

### OTHER STATUTES

DC Code §23-562 ................................................................................16

DC Code §§23-1321 <u>et</u> <u>seq</u>..................................................................21

Court Reorganization Act D.C. Code §11-1521...................................15

D.C. Code §5-335.01 ...........................................................................11

D.C. Code §11-101 ..............................................................................14

D.C. Code §11-101(2) (2001) ...........................................................................15

D.C. Code §11-1729 .......................................................................................15

D.C. Code §6-703 ...........................................................................................15

D.C. Code §23-581 .........................................................................................18

D.C. Code §23-1110 ........................................................................................19

D.C. Code §23-1322(b) and (g) <u>et</u> <u>seq</u>. .....................................................26

D.C. Code §24-201.13 .....................................................................................28

D.C. Code §24-201.14 .....................................................................................28

District of Columbia Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774

    (1973) ("Home Rule Act") ........................................................................7

# RULES

Fed. R. Civ. P. 37(c)(1)(C) and 37(b)(2)(A)(i)-(vi)................................................7, 9

FRE 801(d)(1)(A) ...........................................................................................10

Rule 5 .............................................................................................................28

Rule 5(a)..........................................................................................................28

Rule 37 ...........................................................................................................8

Rule 54 ..........................................................................................................10

# CONSTITUTIONAL PROVISIONS

Fifth Amendment .............................................................................................1

Fourth Amendment ..........................................................................................1

## U.S. Const. Art. I §8, cl. 17 (Seat of Government; Exclusive Jurisdiction Over Places Purchased)

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;--And

## U.S. Const. Art. I, § 8, cl. 18 (Enactment of Laws for Execution of Governmental Powers)

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

## U.S. Const. Amendment IV (Search and Seizure)

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### U.S. Const. Amendment V (Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self-Incrimination; Due Process of Law; Just Compensation for Property)

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### 28 USC §561 (United States Marshals Service)

**(a)** There is hereby established a United States Marshals Service as a bureau within the Department of Justice under the authority and direction of the Attorney General. There shall be at the head of the United States Marshals Service (hereafter in this chapter referred to as the "Service") a Director who shall be appointed by the President, by and with the advice and consent of the Senate.

**(b)** The Director of the United States Marshals Service (hereafter in this chapter referred to as the "Director") shall, in addition to the powers and duties set forth in this chapter, exercise such other functions as may be delegated by the Attorney General.

**(c)** The President shall appoint, by and with the advice and consent of the Senate, a United States marshal for each judicial district of the United States and for the Superior Court of the District of Columbia, except that any marshal appointed for the Northern Mariana Islands may at the same time serve as marshal in another judicial district. Each United States marshal shall be an official of the Service and shall serve under the direction of the Director.

**(d)** Each marshal shall be appointed for a term of four years. A marshal shall, unless that marshal has resigned or been removed by the President, continue to perform the duties of that office after the end of that 4-year term until a successor is appointed and qualifies.

**(e)** The Director shall designate places within a judicial district for the official station and offices of each marshal. Each marshal shall reside within the district for which such marshal is appointed, except that--

    **(1)** the marshal for the District of Columbia, for the Superior Court of the District of Columbia, and for the Southern District of New York may reside within 20 miles of the district for which the marshal is appointed; and

    **(2)** any marshal appointed for the Northern Mariana Islands who at the same time is serving as marshal in another district may reside in such other district.

**(f)** The Director is authorized to appoint and fix the compensation of such employees as are necessary to carry out the powers and duties of the Service and may designate such employees as law enforcement officers in accordance with such policies and procedures as the Director shall establish pursuant to the applicable provisions of title 5 and regulations issued thereunder.

**(g)** The Director shall supervise and direct the United States Marshals Service in the performance of its duties.

**(h)** The Director may administer oaths and may take affirmations of officials and employees of the Service, but shall not demand or accept any fee or compensation therefor.

**(i)** Each marshal appointed under this section should have--

    **(1)** a minimum of 4 years of command-level law enforcement management duties, including personnel, budget, and accountable property issues, in a police department, sheriff's office or Federal law enforcement agency;

    **(2)** experience in coordinating with other law enforcement agencies, particularly at the State and local level;

    **(3)** college-level academic experience; and

    **(4)** experience in or with county, State, and Federal court systems or experience with protection of court personnel, jurors, and witnesses.

## 28 USC §1291 (Final decisions of district courts)

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 USC §1331 (Federal question)

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 USC §1343 (Civil rights and elective francise)

**(a)** The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

**(1)** To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(**2**) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(**3**) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(**4**) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(**b**) For purposes of this section--

(**1**) the District of Columbia shall be considered to be a State; and

(**2**) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### 28 USC§ 566(a) (Powers and duties)

(**a**) It is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law.

### Pub. L. No. 93-198, 87 Stat. 774, §717 ("Home Rule Act – Status of the District") SEC. 717.  [D.C. Official Code ' 1-207.17]

(a)  All of the territory constituting the permanent seat of the Government of the United States shall continue to be designated as the District of Columbia.  The District of Columbia shall remain and continue a body corporate, as provided in section 2 of the Revised Statutes relating to the District (D.C. Code, sec. 1-102) [D.C. Official Code ' 1-102].  Said Corporation shall continue to be charged with all the duties, obligations, responsibilities, and liabilities, and to be vested with all of the powers, rights, privileges, immunities, and assets, respectively, imposed upon and vested in said Corporation or the Commissioner.

### Federal Rules of Civil Procedure, Rule 37(b)(2)(A) & (c)(1)(C) (Failure to Make Disclosures or to Cooperate in Discovery; Sanctions)

**(b) Failure to Comply with a Court Order.**

**(1)** *Sanctions in the District Where the Deposition Is Taken.* If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court.

**(2)** *Sanctions in the District Where the Action Is Pending.*

**(A)** *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an

order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

        **(i)** directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

        **(ii)** prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

        **(iii)** striking pleadings in whole or in part;

        **(iv)** staying further proceedings until the order is obeyed;

        **(v)** dismissing the action or proceeding in whole or in part;

        **(vi)** rendering a default judgment against the disobedient party; or

        **(vii)** treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

        **(B)** *For Not Producing a Person for Examination.* If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may issue any of the orders listed in Rule

37(b)(2)(A)(i)-(vi), unless the disobedient party shows that it cannot produce the other person.

**(C)** *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

**(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.**

**(1)** ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

**(A)** may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

**(B)** may inform the jury of the party's failure; and

**(C)** may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

**Federal Rules of Civil Procedure, Rule 54(b) (Judgment; Costs)**

**(b) Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

**Federal Rules of Evidence, Rule 801(d)(1)(A) (Definitions That Apply to This Article; Exclusions from Hearsay)**

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

**(1) A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

**(A)** is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

10

## D.C. Code §5-335.01 (Enforcement of the post-and-forfeit procedure)

(a) For the purposes of this section, the term "post-and-forfeit procedure" shall mean the procedure enforced as part of the criminal justice system in the District of Columbia whereby a person charged with certain misdemeanors may simultaneously post and forfeit an amount as collateral (which otherwise would serve as security upon release to ensure the arrestee's appearance at trial) and thereby obtain a full and final resolution of the criminal charge.

(b) The resolution of a criminal charge using the post-and-forfeit procedure is not a conviction of a crime and shall not be equated to a criminal conviction. The fact that a person resolved a charge using the post-and-forfeit procedure may not be relied upon by any court of the District of Columbia or any agency of the District of Columbia in any subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability.

(c) Whenever the Metropolitan Police Department ("MPD") or the Office of the Attorney General for the District of Columbia tenders an offer to an arrestee to resolve a criminal charge using the post-and-forfeit procedure, the offer shall be accompanied with a written notice provided to the arrestee describing the post-and-forfeit procedure and the consequences of resolving the criminal charge using this procedure.

(d) The written notice required by subsection (c) of this section shall include, at a minimum, the following information:

(1) The identity of the misdemeanor crime that is to be resolved using the post-and-forfeit procedure and the amount of collateral that is to be posted and forfeited;

(2) A statement that the arrestee has the right to choose whether to accept the post-and-forfeit offer or, alternatively, proceed with the criminal case and a potential adjudication on the merits of the criminal charge;

(3) If the arrestee is in custody, a statement that if the arrestee elects to proceed with the criminal case he or she may also be eligible for prompt release on citation, or will be promptly brought to court for determination of bail;

(4) A statement that the resolution of the criminal charge using the post-and-forfeit procedure will preclude the arrestee from obtaining an adjudication on the merits of the criminal charge;

(5) A statement that the resolution of the criminal charge using the post-and-forfeit procedure is not a conviction of a crime and may not be equated to a criminal conviction, and may not result in the imposition of any sanction, penalty, enhanced sentence, or civil disability by any court of the District of Columbia or any agency of the District of Columbia in any subsequent criminal, civil, or administrative proceeding or administrative action;

(6) A statement that the agreement to resolve the charge using the post-and-forfeit procedure is final after the expiration of 90 days from the date the notice is signed and that, within the 90-day period, the arrestee or the Office of the Attorney General may file a motion with the Superior Court of the District of Columbia to set aside the forfeiture and proceed with the criminal case; and

(7) A statement that, following resolution of the charge using the post-and-forfeit procedure, the arrestee will continue to have an arrest record for the charge at issue, unless the arrestee successfully moves in the Superior Court of the District of Columbia to seal his or her arrest record.

(e) The notice required by subsection (c) of this section shall be offered in the Spanish language to those persons who require or desire notice in this manner, and shall be offered in other languages as is reasonable to ensure meaningful access to the notice for persons who are limited English proficient.

(f) An arrestee provided the written notice required by subsection (c) of this section who wishes to resolve the criminal charge using the post-and-forfeit procedure shall, after reading the notice, sign the bottom of the notice, thereby acknowledging the information provided in the notice and agreeing to accept the offer to resolve the charge using the post-and-forfeit procedure. After the arrestee signs the notice, the arrestee shall be provided with a copy of the signed notice.

13

(g) Within 90 days of the Superior Court of the District of Columbia issuing an updated bond and collateral list, the Chief of Police shall issue a list of all misdemeanor charges that MPD members are authorized to resolve using the post-and-forfeit procedure, and the collateral amount associated with each charge. The Chief shall make the list available to the public, including placing the list on the MPD website.

(h) The Mayor shall submit an annual public report to the Council identifying the total amount of money collected the previous year pursuant to the post-and-forfeit procedure and the number of criminal charges, by specific charge, resolved the previous year using the post-and-forfeit procedure. The data shall be reported separately for instances in which the post-and-forfeit procedure is independently used by the MPD (without the approval, on a case-by-case basis, of either the Office of the Attorney General or the Superior Court of the District of Columbia), and for all other instances in which the post-and-forfeit procedure is used. The report also shall identify the fund or funds in which the post-and-forfeit moneys were placed.

### D.C. Code §11-101 (Judicial Power)

The judicial power in the District of Columbia is vested in the following courts:

(1) The following Federal Courts established pursuant to article III of the Constitution:

14

(A) The Supreme Court of the United States.

(B) The United States Court of Appeals for the District of Columbia Circuit.

(C) The United States District Court for the District of Columbia.

 (2) The following District of Columbia courts established pursuant to article I of the Constitution:

(A) The District of Columbia Court of Appeals.

(B) The Superior Court of the District of Columbia.

## Court Reorganization Act D.C. Code §11-1521

There shall be a District of Columbia Commission on Judicial Disabilities and Tenure (hereafter in this subchapter referred to as the "Commission"). The Commission shall have power to suspend, retire, or remove a judge of a District of Columbia court, as provided in this subchapter.

## D.C. Code § 11-1729 (Service of United States marshal)

The United States Marshal for the District of Columbia shall continue to serve the courts of the District of Columbia, subject to the supervision of the Attorney General of the United States.

## D.C. Code § 16-703 (Process of Criminal Division; fees)

(a) The Criminal Division of the Superior Court may issue process for the arrest of a person against whom an indictment is returned, an information is filed, or a complaint under oath is made.

(b) Process shall --

(1) be under the seal of the court;

(2) bear teste in the name of a judge of the court, and

(3) be signed by a clerk or employee of the court authorized to administer oaths.

(c) In cases arising out of violations of any of the ordinances of the District of Columbia, process shall be directed to the Chief of Police, who shall execute the process and make return thereof in like manner as in other cases.

(d) In all other criminal cases, the process issued by the Superior Court may be directed to the United States marshal or to the Chief of Police.

(e) For services pursuant to subsection (d) of this section the marshal shall receive the fees prescribed by section 15-709(b).

### D.C. Code §23-562 (Execution and return)

(a)(1) A warrant issued pursuant to this subchapter shall be executed by the arrest of the person named. The officer need not have the warrant in his possession at the time of the arrest, but upon request he shall show the warrant to the person as soon as possible. If the officer does not have the warrant in his

16

possession at the time of the arrest, he shall inform the person of the offense charged and of the fact that a warrant has been issued.

(2) A summons shall be served upon a person by delivering a copy to him personally, by leaving it at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein, or by mailing it to the person's last known address.

(b)(1) The officer executing a warrant shall make return thereof to the judicial officer before whom the person is brought for preliminary examination. At the request of the appropriate prosecutor, any unexecuted and unexpired warrant shall be returned to the issuing court or judicial officer and shall be canceled.

(2) On or before the return day the person to whom a summons was delivered for service shall make return thereof to the court or officer before whom the summons is returnable.

(3) At the request of the appropriate prosecutor made at any time while the complaint is pending, a warrant returned unexecuted and not canceled or expired or a summons returned unserved or a duplicate thereof may be delivered by the judicial officer to the marshal or other authorized person for execution or service.

(c)(1) A law enforcement officer within the District of Columbia making an arrest under a warrant issued pursuant to this subchapter, making an arrest without

17

a warrant, or receiving a person arrested by a special policeman or other person

pursuant to § 23-582, or a designated civilian employee of the Metropolitan Police

Department receiving a person arrested by a law enforcement officer within the

District of Columbia or a special policeman or other person pursuant to § 23-582,

shall take the arrested person without unnecessary delay before the court or other

judicial officer empowered to commit persons charged with the offense for which

the arrest was made. This subsection, however, shall not be construed to conflict

with or otherwise supersede section 3501 of Title 18, United States Code. When a

person arrested without a warrant is brought before a judicial officer, a complaint

or information shall be filed forthwith.

(2) Before taking an arrested person to a judicial officer, a law

enforcement officer or a designated civilian employee of the Metropolitan Police

Department, may perform any recording, fingerprinting, photographing, or other

preliminary police duties required in the particular case, and if such duties are

performed with reasonable promptness, the period of time required therefor shall

not constitute a delay within the meaning of this section.

**D.C. Code §23-581 (Arrests without warrant by law enforcement officers)**

(a)(1) A law enforcement officer may arrest, without a warrant having

previously been issued therefor --

18

(A) a person who he has probable cause to believe has committed or is committing a felony;

(B) a person who he has probable cause to believe has committed or is committing an offense in his presence;

(C) a person who he has probable cause to believe has committed or is about to commit any offense listed in paragraph (2) and, unless immediately arrested, may not be apprehended, may cause injury to others, or may tamper with, dispose of, or destroy evidence; and

(D) a person whom he has probable cause to believe has committed any offense which is listed in paragraph (3) of this section, if the officer has reasonable grounds to believe that, unless the person is immediately arrested, reliable evidence of alcohol or drug use may become unavailable or the person may cause personal injury or property damage.

## D.C. Code §23-1110 (Designation of official to take bail or collateral when court is not in session; issuance of citations)

(a) The judges of the Superior Court of the District of Columbia shall have the authority to appoint some official of the Metropolitan Police Department to act as a clerk of the court with authority to take bail or collateral from persons charged with offenses triable in the Superior Court at all times when the court is not open and its clerks accessible. The official so appointed shall have the same authority at those times with reference to taking bonds or collateral as the clerk of the

19

Municipal Court had on March 3, 1933; shall receive no compensation for these services other than his regular salary; shall be subject to the orders and rules of the Superior Court in discharge of his duties, and may be removed as the clerk at any time by the judges of the court. The United States District Court for the District of Columbia shall have power to authorize the official appointed by the Superior Court to take bond of persons arrested upon writs and process from that court in criminal cases between 4 o'clock postmeridian and 9 o'clock antemeridian and upon Sundays and holidays, and shall have power at any time to revoke the authority granted by it.

(b)(1) An officer or member of the Metropolitan Police Department who arrests without a warrant a person for committing a misdemeanor may, instead of taking him into custody, issue a citation requiring the person to appear before an official of the Metropolitan Police Department designated under subsection (a) of this section to act as a clerk of the Superior Court.

(2) Whenever a person is arrested without a warrant for committing a misdemeanor and is booked and processed pursuant to law, an official of the Metropolitan Police Department designated under subsection (a) of this section to act as a clerk of the Superior Court may issue a citation to him for an appearance in court or at some other designated place, and release him from custody.

20

(3) No citation may be issued under paragraph (1) or (2) unless the person authorized to issue the citation has reason to believe that the arrested person will not cause injury to persons or damage to property and that he will make an appearance in answer to the citation.

(4) Whoever willfully fails to appear as required in a citation, shall be fined not more than the maximum provided for the misdemeanor for which such citation was issued or imprisoned for not more than 180 days, or both. Prosecution under this paragraph shall be by the prosecuting officer responsible for prosecuting the offense for which the citation is issued.

## D.C. Code § 23-1321 (Release prior to trial)

(a) Upon the appearance before a judicial officer of a person charged with an offense, other than murder in the first degree, murder in the second degree, or assault with intent to kill while armed, which shall be treated in accordance with the provisions of §23-1325, the judicial officer shall issue an order that, pending trial, the person be:

(1) Released on personal recognizance or upon execution of an unsecured appearance bond under subsection (b) of this section;

(2) Released on a condition or combination of conditions under subsection (c) of this section;

21

(3) Temporarily detained to permit revocation of conditional release under §23-1322; or

(4) Detained under §23-1322(b).

(b) The judicial officer shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to the condition that the person not commit a local, state, or federal crime during the period of release, unless the judicial officer determines that the release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community. (c)(1) If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, the judicial officer shall order the pretrial release of the person subject to the:

(A) Condition that the person not commit a local, state, or federal crime during the period of release; and

(B) Least restrictive further condition, or combination of conditions, that the judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition or combination of conditions that the person during the period of release shall:

22

(i) Remain in the custody of a designated person or organization that agrees to assume supervision and to report any violation of a condition of release to the court, if the designated person or organization is able to reasonably assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

(ii) Maintain employment, or, if unemployed, actively seek employment;

(iii) Maintain or commence an educational program;

(iv) Abide by specified restrictions on personal associations, place of abode, or travel;

(v) Avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

(vi) Report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

(vii) Comply with a specified curfew;

(viii) Refrain from possessing a firearm, destructive device, or other dangerous weapon;

(ix) Refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance without a prescription by a licensed medical practitioner; the terms "narcotic drug" and "controlled substance" shall

23

have the same meaning as in section 102 of the District of Columbia Uniform

Controlled Substances Act of 1981, effective August 5, 1981, (D.C. Law 4-29;

D.C. Official Code § 48-901.02);

(x) Undergo medical, psychological, or psychiatric

treatment, including treatment for drug or alcohol dependency, if available, and

remain in a specified institution if required for that purpose;

(xi) Return to custody for specified hours following

release for employment, schooling, or other limited purposes, except that no person

may be released directly from the District of Columbia Jail or the Correctional

Treatment Facility for these purposes;

(xii) Execute an agreement to forfeit upon failing to

appear as required, the designated property, including money, as is reasonably

necessary to assure the appearance of the person as required, and post with the

court the indicia of ownership of the property, or a percentage of the money as the

judicial officer may specify;

(xiii) Execute a bail bond with solvent sureties in

whatever amount is reasonably necessary to assure the appearance of the person as

required; or

24

(xiv) Satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

(2) In considering the conditions of release described in paragraph (1)(B)(xii) or (xiii) of this subsection, the judicial officer may upon his own motion, or shall upon the motion of the government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation or the use as collateral of property that, because of its source, will not reasonably assure the appearance of the person as required.

(3) A judicial officer may not impose a financial condition under paragraph (1)(B)(xii) or (xiii) of this subsection to assure the safety of any other person or the community, but may impose such a financial condition to reasonably assure the defendant's presence at all court proceedings that does not result in the preventive detention of the person, except as provided in § 23-1322(b).

(4) A person for whom conditions of release are imposed and who, after 24 hours from the time of the release hearing, continues to be detained as a result of inability to meet the conditions of release, shall upon application be entitled to have the conditions reviewed by the judicial officer who imposed them. Unless the conditions of release are amended and the person is thereupon released,

on another condition or conditions, the judicial officer shall set forth in writing the reasons for requiring the conditions imposed. A person who is ordered released on a condition that requires that the person return to custody after specified hours shall, upon application, be entitled to a review by the judicial officer who imposed the condition. Unless the requirement is removed and the person is released on another condition or conditions, the judicial officer shall set forth in writing the reasons for continuing the requirement. In the event that the judicial officer who imposed the conditions of release is not available, any other judicial officer may review the conditions.

(5) The judicial officer may at any time amend the order to impose additional or different conditions of release.

## D.C. Code §23-1322(b) & (g) (Detention prior to trial)

(b)(1) The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in §23-1321(c) will reasonably assure the appearance of the person as required and the safety of any other person and the community, upon oral motion of the attorney for the government, in a case that involves:

(A) A crime of violence, or a dangerous crime, as these terms are defined in §23-1331;

26

(B) An offense under section 502 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-164; D.C. Official Code §22-722);

(C) A serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness or juror; or

(D) A serious risk that the person will flee.

(2) If, after a hearing pursuant to the provision of subsection (d) of this section, the judicial officer finds by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of the person as required, and the safety of any other person and the community, the judicial officer shall order that the person be detained before trial.

***

(g) In a detention order issued under subsection (b) of this section, the judicial officer shall:

(1) Include written findings of fact and a written statement of the reasons for the detention;

(2) Direct that the person be committed to the custody of the Attorney General of the United States for confinement in a corrections facility separate, to

the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

(3) Direct that the person be afforded reasonable opportunity for private consultation with counsel; and

(4) Direct that, on order of a judicial officer or on request of an attorney for the government, the person in charge of the corrections facility in which the person is confined deliver the person to the United States Marshal or other appropriate person for the purpose of an appearance in connection with a court proceeding.

## D.C. Code § 24-201.13 (Commitment by Marshal)

Nothing in §§24-201.12 and 24-201.15 shall be construed to impair or interfere with the authority of the Marshal of the District to commit persons to the Jail or to produce them in open court or before any judicial officer when thereto required.

## D.C. Code § 24-201.14 (Delivery of prisoners to Marshal)

It shall be the duty of the Superintendent of the Washington Asylum and Jail to receive such prisoners and to deliver them to the Marshal or his duly authorized deputy, on the written request of either, for the purpose of taking them before any court or judicial officer, as provided in §24-201.13.

## D.C. SCR-Crim. Rule 5 (Initial proceedings before the Court)

(a) Appearance before the Court.  An officer within the District of Columbia making an arrest under a warrant issued by the Superior Court upon a complaint, making an arrest without a warrant, or receiving a person arrested by a special policeman or other authorized person shall take the arrested person without unnecessary delay before the Court. Before taking an arrested person before the Court, an officer may perform any recording, fingerprinting, photographing, or other preliminary police duties required in the particular case, and if such duties are performed with reasonable promptness, the period of time required therefor shall not constitute delay within the meaning of  this Rule. This Rule shall not be construed to conflict with or otherwise supersede section 3501 of title 18, United States Code. If a person arrested without a warrant is brought before the Court, a complaint or information shall be filed forthwith.

(b) Statement by the Court.  The Court shall inform the defendant of the complaint against the defendant and of any affidavit filed therewith, of the defendant's right to retain counsel, and of the defendant's right to the assignment of counsel if the defendant is unable to obtain counsel. The Court shall also inform the defendant of the defendant's right to have a preliminary examination if a felony is charged. The Court shall inform the defendant that the defendant is not required to make a statement and that any statement made by the defendant may be used

against the defendant. The Court shall allow the defendant reasonable time and

opportunity to consult counsel and shall release

or detain the defendant as provided by statute or in these Rules.

(c) Probable cause.  If at this hearing the Court imposes any conditions of

release which constitute a significant restraint on pretrial liberty upon any person

who was arrested without an arrest warrant, the Court shall, unless the defendant

waives an initial probable cause determination, require the prosecutor to file with

the Clerk of the Criminal Division by the end of the next working day a copy of a

sworn statement of fact offered to establish probable cause; except that in

nonmoving traffic violation cases, the traffic citation may be considered by the

Court as sufficient to establish probable cause. Upon the filing of the sworn

statement of fact, the Court shall then proceed promptly to determine if there is

probable cause to believe that an offense has been committed and that the

defendant committed it. The determination or probable cause may be made by the

Court without conducting a hearing. The Court's finding of probable cause may be

based upon hearsay evidence in whole or in part. The Court shall enter its

determination as to probable cause on the case jacket along with the date of the

determination. If the Court determines, based on the information offered by the

prosecutor, that there is no probable cause, the Court shall release the defendant,

without significant restraints on the defendant's liberty, and shall order the defendant to appear for the next Court proceeding.

(d) Preliminary examination.

(1) In general.  The purpose of a preliminary examination is not for discovery. The defendant shall not be called upon to plead. If the defendant waives preliminary examination, the Court shall forthwith hold the defendant to answer in the Court having jurisdiction to try the defendant. If the defendant does not waive examination, the Court shall hear the evidence within the time limits set forth in subparagraph (2). If from the evidence it appears that there is probable cause to believe that an offense has been committed and that the defendant committed it, the Court shall forthwith hold the defendant to answer in the Court having jurisdiction to try the defendant. The finding of probable cause may be based upon hearsay evidence in whole or in part. The defendant may cross examine adverse witnesses and may introduce evidence. Objections to evidence on the ground that it was acquired by unlawful means are not properly made at the preliminary examination. Motions to suppress must be made to the Court as provided in Rules 12 and 47 of these Rules. If from the evidence it appears that there is no probable cause to believe that an offense has been committed or that the defendant committed it, the Court shall dismiss the complaint and discharge the defendant. The discharge of the defendant shall not preclude the government from instituting

a subsequent prosecution of the same offense. After concluding the proceeding the Court shall transmit forthwith to the appropriate clerk all papers in the proceeding and any security taken by it.

       (2) Time limits.  A preliminary examination shall be held within a reasonable time, but in any event not later than 10 days following the initial appearance if the defendant is detained and not later than 20 days if the defendant is not detained: provided however, that the preliminary examination shall not be held if the defendant is indicted or if an information against the defendant is filed before the time set for the preliminary examination. With the consent of the defendant and upon a showing of good cause, taking into account the public interest in the prompt disposition of criminal cases, time limits specified in this paragraph may be extended 1 or more time [times] by the Court. In the absence of such consent by the defendant, time limits may be extended only upon a showing that extraordinary circumstances exist and that delay is indispensable to the interest of justice.

   (e) Definition of "Court".  As used in this Rule, the term "Court" shall mean a Superior Court judge or magistrate judge.

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the
### Appellate CM/ECF System

United States Court of  Appeals for the District of Columbia Circuit Docket Number(s):

> 11-5115

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on (date)  October 22, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature        *Julia C White*

*******************************************************************

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the
### Appellate CM/ECF System

United States Court of  Appeals for the District of Columbia Circuit Docket Number(s):

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on (date) _____ .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature